UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
HAKAM BAKEER,

             Plaintiff,

     - against -

NIPPON CARGO AIRLINES, CO., LTD, et al.,

             Defendants.
------------------------------------------------------------X
JUDITH MICHAUD, *as Administratix of the*
*Estate of DAVID MICHAUD, deceased,*

             Plaintiff,

     - against -

NIPPON CARGO AIRLINES, CO., LTD, et al.

             Defendants.
------------------------------------------------------------X
MARK WEAVER,

             Plaintiff,

     - against -

NIPPON CARGO AIRLINES, CO., LTD, et al.

             Defendants.
------------------------------------------------------------X
DOUGLAS FRITH,

             Plaintiff,

     - against -

NIPPON CARGO AIRLINES, CO., LTD, et al.

             Defendants.

------------------------------------------------------------X

**REPORT AND**
**RECOMMENDATION**

09 CV 3374 (RRM)

09 CV 3375 (RRM)

09 CV 3377 (RRM)

09 CV 3378 (RRM)

On August 5, 2009, plaintiffs Hakam Bakeer, Mark Weaver, Douglas Frith, and Judith

Michaud, on behalf of her deceased husband, David Michaud (collectively, "plaintiffs"), filed

this action against defendants Nippon Cargo Airlines, Co. Ltd. ("NCA"), PARC U.S., Inc. ("PARC U.S."), PARC Aviation Limited ("PARC Aviation"),[1] Hawaii Aviation Contract Services, Inc. ("HACS"),[2] and Personnel Aviation Recruitment Consultants Limited ("PARCL"),[3] alleging various claims of employment discrimination based on race, national origin, age, citizenship, and alienage, pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. ("Title VII"), the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621, et seq. ("ADEA"), the Civil Rights Act of 1866, 42 U.S.C. §§ 1981, et seq. ("Section 1981"), the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law §§ 290, et seq., and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-107. On April 20, 2010, all five defendants filed a joint motion to dismiss plaintiffs' Complaints on grounds of *forum non conveniens,* and defendant NCA also moved to dismiss all of the claims against it for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). On June 7, 2010, the aforementioned motions were referred to the undersigned to prepare a Report and Recommendation.


## FACTUAL BACKGROUND

At the time that the Complaints were filed, plaintiff Bakeer was a 58 year old American citizen, plaintiff Weaver was a 47 year old American citizen, and plaintiff Frith was 52 years of

---

[1] Plaintiffs Bakeer and Weaver sued both of the PARC defendants. Frith sued only PARC Aviation, and Michaud sued neither. All four plaintiffs have sued NCA.

[2] Only plaintiff Michaud sued HACS.

[3] Only plaintiff Frith sued PARCL.

age and an Australian citizen. (Bakeer Compl.[4] ¶ 1; Weaver Compl. ¶ 1; Frith Compl. ¶ 1). All three of these plaintiffs, along with David Michaud, who was a 56 year old American citizen at the time of his death, are Caucasian. (Bakeer Compl. ¶ 1; Weaver Compl. ¶ 1; Michaud Compl. ¶ 1; Frith Compl. ¶ 1).

Plaintiffs allege in their respective Complaints that defendant NCA employed over 500 employees during the relevant time period covered by these actions and that NCA had its principal place of business at John F. Kennedy International Airport ("JFK Airport") in Queens, New York.[5] (Bakeer Compl. ¶¶ 1, 6, 9; Weaver Compl. ¶¶ 1, 6, 9; Michaud Compl. ¶¶ 1, 5, 7; Frith Compl. ¶¶ 1, 6, 9). Plaintiffs further allege that they were hired as Flight Engineers by NCA to fly the B747-200 aircraft (the "Classic") on cargo routes in the United States and to Japan. (Bakeer Compl. ¶¶ 1, 17, 19; Weaver Compl. ¶¶ 1, 17, 19; Michaud Compl. ¶¶ 1, 14, 16; Frith Compl. ¶¶ 1, 17, 19). According to the Complaints, plaintiffs Bakeer, Weaver, and Frith worked as Flight Engineers for defendant NCA between 1998 and 2008 (Bakeer Compl. ¶ 17; Weaver Compl. ¶ 17; Frith Compl. ¶ 17), and plaintiff Michaud was employed by NCA from 2001 until 2008. (Michaud Compl. ¶ 14).

---

[4]Citations to "Bakeer Compl." refer to the Complaint filed by Hakam Bakeer on August 5, 2009, bearing docket number 09 CV 3374; citations to "Weaver Compl." refer to the Complaint filed by Mark Weaver on August 5, 2009, bearing docket number 09 CV 3377; citations to "Frith Compl." refer to the Complaint filed by Douglas Frith on August 5, 2009, bearing docket number 09 CV 3378; and citations to "Michaud Compl." refer to the Complaint filed by Judith Michaud, as Administratix of the Estate of David Michaud, on August 5, 2009, bearing docket number 09 CV 3375.

[5]In plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint and in Support of Plaintiffs' Cross-Motion to Amend the Complaints ("Pls.' Mem."), dated June 2, 2010, plaintiffs assert something slightly different – namely, that "NCA has been registered as a foreign business corporation in the State of New York. NCA has its principal executive office at JFK. . . . Even NCA's website admits the existence of a New York branch office." (Pls.' Mem. at 15-16 (emphasis added)).

3

Defendants concede that NCA is a Japanese corporation engaged in the business of international air-cargo transportation. (Ikeda Dec.[6] ¶¶ 4-5). According to defendants, NCA is incorporated under the laws of Japan and transports cargo to and from Japan throughout various airports in Asia, Europe, and the United States, including JFK Airport. (Id.) Contrary to plaintiffs' assertions, NCA contends that its principal place of business and its headquarters are located in Narita International Airport and Tokyo, Japan. (Id. ¶ 5). NCA represents that its cargo flights originate and terminate at various hubs, referred to as "On-Line Points," where NCA flights land, deliver and load cargo, and refuel. (Id. ¶ 6). Until August 25, 2008, NCA maintained an On-Line Point at JFK Airport. (Id. ¶ 7). However, due to fuel price increases and decreased demand, NCA suspended service to JFK Airport from August 2008 until May 19, 2009. (Id.)

Defendants also concede that plaintiffs are former Flight Engineers, also known as Second Officers, who were hired to staff NCA flights on the Classics fleet. The Classics cannot be flown without a Flight Engineer on board to monitor and troubleshoot engine power pressure, fuel, hydraulic, electrical, and other aircraft systems. (Id. ¶¶ 16, 25, 31, 36, 41). NCA contends, however, that Flight Engineers are not qualified or licensed to pilot Classics, which must be flown by licensed pilots. (Id. ¶ 16).

Defendants represent that in order to secure Flight Engineers to staff NCA flights, NCA contracted with flight crew providers that recruited, hired, and negotiated employment contracts

---

[6]Citations to "Ikeda Decl." refer to the Declaration of Daisuke Ikeda, the Deputy General Manager of Flight Operations for NCA, dated April 20, 2010, and submitted in support of Defendants' Motion to Dismiss.

4

on behalf of Flight Engineers, who were then assigned to NCA. (Id. ¶¶ 18-19). For flights from NCA's On-Line Points in Asia, NCA contracted with All Nippon Airways ("ANA") to obtain Flight Engineers. (Id. ¶¶ 9, 18).[7] For flights to On-Line Points in Europe and the Americas, NCA contracted with HACS and PARC Aviation, to supply Flight Engineers. (Id. ¶ 18).

According to defendants, ANA is a Japanese company, engaged in commercial passenger and cargo aviation. (Id. ¶¶ 9, 47, 51; Defs.' Mem.[8] at 8). Its main office is in Tokyo, Japan and all of its major shareholders are Japanese entities. (Defs.' Mem. at 8). ANA directly employs Flight Engineers who are members of a Japanese labor union known as All Nippon Airways Crew Association ("the union" or "the Japanese union"). (Id.; Ikeda Decl. ¶ 18). Under the collective bargaining agreement with the union (the "ANA CBA"), ANA was obligated to provide specific benefits to its Flight Engineers, including mandated pay increases, retirement benefits, and alternative employment arrangements. (Defs.' Mem. at 8-9; Ikeda Decl. ¶ 48).

HACS is a Hawaiian corporation with its principal and only place of business in Hawaii. (Bell Decl.[9] ¶ 5). Hawaii is also where all of HACS' officers and directors are located and where it maintains all of its records. (Id. ¶¶ 6-7). HACS has never had an office in New York or any employees working in New York. (Id. ¶ 8). Since 1998, NCA has contracted with HACS

---

[7]Further information regarding the arrangement between ANA and NCA was provided in Exhibit G to the Declaration of Diana M. Carlino, an associate at the Law Office of Todd J. Krouner, attorneys for plaintiffs ("Carlino Decl.").

[8]Citations to "Defs.' Mem." refer to the defendants' Memorandum of Law in Support of Defendants' Joint Motion to Dismiss the Complaints for *Forum Non Conveniens* and Defendant Nippon Cargo Airlines' Motion to Dismiss the Complaints Pursuant to Federal Rule of Civil Procedure 12(b)(6), dated April 20, 2010.

[9]Citations to "Bell Decl." refer to the Declaration of Alexander Bell in Support of Defendants' Motion to Dismiss the Complaints for *Forum Non Conveniens*, dated April 20, 2010. Bell is the owner and Chairman of the Board of HACS. (Bell Decl. ¶ 1).

for HACS to provide NCA with flight crews, in exchange for which NCA paid HACS a fee per Flight Engineer. (Ikeda Decl. ¶¶ 9, 19). HACS entered into individual employment contracts with these Flight Engineers, setting the terms and conditions of employment, including compensation and duration of employment. (Id. ¶¶ 17-19; Bell Decl. ¶ 10). NCA asserts that it was not a party to these contracts and did not pay the Flight Engineers directly; their salaries were paid by HACS. (Ikeda Decl. ¶ 19).

PARC Aviation is a privately held Irish corporation with its principal place of business in Dublin, Ireland and with additional offices in Shannon, Ireland and in Tokyo. (Collins Decl.[10] ¶ 3). PARC Aviation contracts with NCA to provide flight crews, mechanics, and consultants for aviation operations in 30 countries worldwide. (Id. ¶¶ 3-4). Under PARC Aviation's contract with NCA, which specifies that it is governed by the laws of England, PARC Aviation identifies qualified candidates and presents them to NCA for its consideration. (Id. ¶¶ 4-5). NCA then interviews each candidate and decides whether to utilize each person as part of its flight crew. (Id. ¶ 5). If selected, a candidate enters into a written employment contract with a subsidiary of PARC Aviation, which then handles all of the compensation and benefits owed to that individual. (Id.) As with its arrangement with HACS, NCA asserts that it does not compensate the PARC Aviation hires, nor is NCA a party to their employment contracts. (Id. ¶¶ 5, 8). United States residents, who are assigned by PARC Aviation to an NCA base operating in the United States, enter into employment contracts with PARC U.S., one of PARC Aviation's

---

[10]Citations to "Collins Decl." refer to the Declaration of Frank Collins in Support of Defendants' Motion to Dismiss the Complaints for *Forum Non Conveniens*, dated April 16, 2010. Collins is currently the Director of Compliance and Regulatory Affairs at PARC Aviation, and he previously served as the Group Tax and Compliance Manager.

subsidiaries.[11] (Id. ¶ 6). PARC U.S. is a Delaware corporation, licensed to do business in New York, with its principal place of business in New York. (Id.)

According to defendants, plaintiff Mark Weaver first communicated with PARC Aviation in February of 1998, seeking employment as a Flight Engineer for NCA. (Id. ¶ 9). At that time, he provided his contact information, which included addresses in both Hawaii and Virginia. (Id.) After PARC Aviation presented his qualifications to NCA, Weaver was interviewed by NCA in Tokyo in October of 1998, where he completed flight simulator testing, had a medical examination, and later attended a training session. (Id. ¶ 10; Ikeda Decl. ¶¶ 42-43). Mr. Weaver entered into an employment agreement with PARC U.S., dated October 15, 1998, accepting a position as an NCA Flight Engineer assigned to NCA's JFK On-Line Point. (Collins Decl. ¶ 11; Ikeda Decl. ¶ 44). During the course of his employment, plaintiff Weaver resided in Virginia, which is where he received his payroll checks. (Collins Decl. ¶ 12).

In March of 1998, plaintiff Frith wrote to PARC Aviation in response to an advertisement relating to potential employment. (Id. ¶ 14). Mr. Frith listed his return address as being in Hong Kong. (Id.) NCA conducted a screening interview, simulator test, and medical examination of Frith at London's Heathrow Airport (id. ¶ 15), and later, Frith attended an NCA training session in Japan. (Id. ¶ 17; Ikeda Decl. ¶ 33). When Mr. Frith entered into an employment agreement with PARCL on May 14, 1998, he resided in Australia, but he later relocated to England in or

---

[11]PARC Aviation has another subsidiary, Personnel Aviation Recruitment Consultants Ltd. ("PARCL"), which is organized under the laws of the Bailiwick of Jersey and is located on the Isle of Jersey in the Channel Islands. (Collins Decl. ¶ 7). PARCL is not licensed to do business in the United States, has no place of business in the United States, nor does it have any "employees who are United States citizens residing in the United States." (Id.)

about November 1998. (Collins Decl. ¶ 16). In or about December of 2006, Mr. Frith again

relocated his residence, to Alaska, in anticipation of a reassignment from NCA's On-Line Point

in Amsterdam to the JFK On-Line Point. (Id. ¶ 19; Ikeda Decl. ¶ 32).

In February of 2003, at the request of NCA, plaintiff Bakeer, who was already employed

for NCA, was contacted by PARC Aviation, and asked if he wished to continue working as a

Flight Engineer for NCA, but with a new employment agreement with PARC U.S. (Collins

Decl. ¶ 21). On November 10, 2003, Bakeer, who was living in Virginia at the time, entered into

an agreement with PARC U.S. and was assigned to the JFK On-Line Point. (Id. ¶¶ 22-23; Ikeda

Decl. ¶¶ 36, 39). Although originally from Virginia, Bakeer later moved to Texas. (Collins

Decl. ¶ 23). According to defendants, Bakeer received his physical examinations either in

Tokyo, Japan, New York, or Anchorage, Alaska. (Ikeda Decl. ¶ 37).

Defendants again emphasize that NCA was not a party to any of these employment

agreements and that plaintiffs were not employees of NCA. (Id. ¶¶ 30, 35, 40, 46; Collins Decl.

¶ 8). Defendants also assert that none of the communications or negotiations regarding the terms

of the employment contracts took place in New York (Collins Decl. ¶¶ 9, 14, 22), and while

compensation checks for Bakeer and Weaver were drawn on a New York bank account, the

checks were sent to plaintiffs' home addresses, which were outside of New York. (Id. ¶¶ 12, 18,

24; Defs.' Mem. at 27). While most of Bakeer's, Weaver's, and Frith's training occurred in

Japan, defendants concede that they may have also received some training in New York. (Ikeda

Decl. ¶¶ 33, 38, 43). Lastly, the letters notifying each of these three plaintiffs of the termination

of their employment agreements were sent to their respective homes in Virginia, Alaska, and

8

Texas. (Collins Decl. ¶¶ 32-34).

The final plaintiff, Michaud, was hired by HACS in October of 2001 and he negotiated an employment contract with HACS setting forth the duration of his assignment to NCA, as well as the terms and conditions of his employment, including benefits and compensation, which would be paid by HACS. (Bell Decl. ¶¶ 9-10; Ikeda Decl. ¶ 25). The negotiations in connection with this agreement took place over the phone, by email, fax, or regular mail between HACS' office in Hawaii and Michaud's home in California. (Bell Decl. ¶ 11). Michaud was then sent to Tokyo for training and for the required examinations. (Id. ¶¶ 12-13; Ikeda Decl. ¶ 26). After his initial physical examination, his annual medical exams were performed in Anchorage, Alaska. (Ikeda Decl. ¶ 26). HACS assigned Michaud to both NCA's San Francisco and JFK On-Line Points, with all salary payments sent to Michaud's personal account, which was not located in New York. (Id. ¶ 28; Bell Decl. ¶¶ 14-15).

In February of 2008, Michaud joined the National Union of General Workers Tokyo Nambu, a Japanese labor union. (Ikeda Decl. ¶ 29). The union demanded that NCA enter into a collective bargaining agreement, which among other things, would confirm that all of the contracted Flight Engineers would be direct employees of NCA. (Id.) The union also demanded that NCA cancel Michaud's termination notice. (Id.) NCA responded that it was not the employer of the Flight Engineers and the union eventually dropped its demands.[12] (Id.)

Each of the plaintiffs was terminated from his respective position as a Flight Engineer in

---

[12]Plaintiffs allege that "[j]ust because the Japanese union apparently caved into NCA's pressure, does not render its discriminatory treatment toward its non-union employees any less discriminatory." (Pls.' Mem. at 35).

9

March of 2008,[13] when NCA completed the retirement of the Classics fleet and began flying

exclusively 747-400s, which were considered to be technologically superior to the Classics. (Id.

¶¶ 20, 23, 52-53). The 747-400s were more fuel efficient, could carry more fuel, and required

fewer crew members in that they could be flown without Flight Engineers. (Id. ¶ 20). According

to defendants, none of the important meetings and discussions regarding assignments, contract

terms, and the phase-out of the Classics fleet took place in New York; they took place by e-mail,

fax, regular mail, or over the phone with NCA's headquarters in Japan, with HACS's office in

Hawaii, PARC Aviation's headquarters in Ireland, and with plaintiffs' home states; in-person

meetings also occurred in Ireland, the Netherlands, or Japan. (Collins Decl. ¶ 28; Ikeda Decl. ¶¶

13-14; Bell Decl. ¶ 11).

Plaintiffs commenced this action on August 5, 2009, alleging that defendants had

engaged in discriminatory treatment based on national origin, race, and age by: 1) failing to offer

plaintiffs the same opportunities for paid training to become pilots – an "upgrade" – that was

offered to NCA Japanese Flight Engineers; 2) by failing to pay cost of living increases to non-

Japanese employees while such payments were made to Japanese Flight Engineers; 3) by

accelerating the retirement of the Classics fleet and offering job placement and retirement

benefits to Japanese Flight Engineers, but not to plaintiffs; and 4) by hiring and training younger

---

[13]Each plaintiff alleges termination on March 31, 2008. (Bakeer Compl. ¶ 17; Weaver Compl. ¶ 17; Michaud Compl. ¶ 14; Frith Compl. ¶ 17). Each of the three plaintiffs hired by PARC Aviation, PARCL, and PARC U.S. received a letter, dated December 18, 2007, notifying them that their employment would expire on March 31, 2008; Weaver's letter was sent from Dublin, Ireland to his home in Virginia; Frith's letter was sent from Dublin, Ireland to his home in Alaska; Bakeer's letter was sent from Dublin, Ireland to his home in Texas. (Collins Decl. ¶¶ 31-34). Michaud received notification of his termination from HACS via email. (Bell Decl. ¶¶ 19-21).

pilots to fly the new equipment. (Bakeer Compl. ¶¶ 32-35, 44-48, 57-60; Weaver Compl. ¶¶ 32-35, 44-48, 57-60; Michaud Compl. ¶¶ 25-29, 37-40, 48-50; Frith Compl. ¶¶ 32-35, 44-48, 57-62). Plaintiffs also assert that they were terminated in retaliation for their complaints about this discrimination, a protected activity under Title VII, the ADEA, Section 1981, the NYSHRL, and the NYCHRL. (Bakeer Compl. ¶¶ 38-41, 51-54, 63-65, 75-78, 88-91; Weaver Compl. ¶¶ 38-41, 51-54, 63-65, 75-80, 90-93, 103-106; Michaud Compl. ¶¶ 32-34, 43-45, 52-54, 63-65, 74-76; Frith Compl. ¶¶ 38-41, 51-54, 65-68, 76-79, 89-92, 102-105).

Plaintiff Weaver includes two additional claims in his Complaint, alleging violations of his rights under the Family and Medical Leave Act ("FMLA"), in that defendants denied his request for intermittent leave to care for his father and then retaliated against him by docking his pay when he attempted to exercise his right to FMLA leave. (Weaver Compl. ¶¶ 66-80). Plaintiff Frith's Complaint contains claims of disability discrimination, failure to accomodate, and retaliation, in violation of the Americans with Disability Act of 1990 ("ADA"), 42 U.S.C. § 12112.

Defendants now jointly move to dismiss plaintiffs' Complaints on *forum non conveniens* grounds, contending that plaintiffs have no connection to the Eastern District of New York,[14] that Japan, the alternative forum selected by defendants, provides an adequate and suitable forum for

---

[14]During the oral argument on these motions, defendants' counsel first asserted that "there is absolutely no connection whatsoever to the Eastern District of New York that would cause the plaintiffs to have filed their case here," but later commented that "I think there are far more contact[s] and far more issues that are going to need to be resolved in Japan." (Transcript from Oral Argument Held on October 13, 2010 ("Tr.") at 6, 27). As discussed infra at 19-28, 38-39, this case clearly involves connections to this district. (Id. at 15). While the significance of these contacts might be in dispute, the existence of at least some connection to this district cannot be denied.

adjudicating plaintiffs' claims, and that the balance of public and private interests supports the choice of Japan as the appropriate forum for this case. In the alternative, defendant NCA raises various arguments in connection with its Motion to Dismiss plaintiffs' Complaints pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

For the reasons stated below, the Court respectfully recommends that defendants' motion to dismiss on *forum non conveniens* grounds be denied. It is further recommended that NCA's motion to dismiss for failure to state a claim under Rule 12(b)(6) be granted in part and denied in part as detailed herein.

## DISCUSSION

A. Motion to Dismiss for *Forum Non Conveniens*

1) Legal Standard

The doctrine of *forum non conveniens* allows a court to "resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 507 (1947). A court has discretion to dismiss on *forum non conveniens* grounds "'when an alternative forum has jurisdiction to hear the case, and . . . trial in the chosen forum would establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience, or . . . the chosen forum is inappropriate because of considerations affecting the court's own administrative and legal problems.'" Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. 422, 423 (2007) (quoting American Dredging Co. v. Miller, 510 U.S. 443, 447-48 (1994)). The Second Circuit has held that the

decision whether to dismiss a case on *forum non conveniens* grounds "'lies wholly within the broad discretion of the district court and may be overturned only when [the Court of Appeals] believe[s] that discretion has been clearly abused.'" Iragorri v. United Techs. Corp., 274 F.3d 65, 72 (2d Cir. 2001) (emphasis in original) (quoting Scottish Air Int'l, Inc. v. British Caledonian Group, PLC, 81 F.3d 1224, 1232 (2d Cir. 1996)); see also Capital Currency Exch., N.V. v. Nat'l Westminster Bank, PLC, 155 F.3d 603, 609 (2d Cir. 1998) (holding that appellate court review of dismissals on *forum non conveniens* grounds is "extremely limited"). Defendants seeking to dismiss a case on *forum non conveniens* grounds "ordinarily bear[] a heavy burden in opposing the plaintiff's chosen forum." Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. at 423.

In considering motions to dismiss for *forum non conveniens*, the Second Circuit has established the following three-step test:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (citing Iragorri v. United Tech. Corp., 274 F.3d at 73-74); see also Republic of Colombia v. Diageo No. Am., Inc., 531 F. Supp. 2d 365, 402-03 (E.D.N.Y. 2007).

### a) Step One - Plaintiffs' Choice of Forum

Under the first step, the Court must determine what degree of deference is to be given to

13

the plaintiffs' choice of forum. Republic of Colombia v. Diageo No. Am., Inc., 531 F. Supp. 2d at 402 (citing Iragorri v. United Techs. Corp., 274 F.3d at 71). Courts generally give deference to a plaintiff's choice of forum, for "unless the balance is strongly in favor of the defendant, the plaintiff's choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. at 508. Thus, in reviewing a motion to dismiss for *forum non conveniens*, the defendant has the burden of demonstrating that trial in the chosen forum would be unnecessarily burdensome for the defendant or the court; otherwise, the assumption is that plaintiff's choice of forum should stand. Iragorri v. United Techs. Corp., 274 F.3d at 71.

The degree of deference given to a plaintiff's choice of forum varies depending on the circumstances. When a United States resident brings suit in his home forum, that choice is entitled to great deference. Koster v. (Am.) Lumbermens Mut. Cas. Co., 330 U.S. 518, 524 (1947); see also Piper Aircraft Co. v. Reyno, 455 U.S. 235, 256 n.23 (1981). The reason deference is given to a plaintiff's choice of his home forum is "because it is presumed to be convenient." Iragorri v. United Techs. Corp., 274 F.3d at 71 (citing Piper Aircraft Co. v. Reyno, 454 U.S. at 255-56). Less deference, however, is accorded the choice of a United States forum by a foreign plaintiff. Piper Aircraft Co. v. Reyno, 454 U.S. at 255-56 (holding that "[w]hen the plaintiff is foreign . . . th[e] assumption [favoring the plaintiff's choice of forum] is much less reasonable").

In evaluating the degree of deference to be given to a plaintiff's choice of a United States forum other than his home forum, the Second Circuit has stated that: "The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law

14

recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." Iragorri v. United Techs. Corp., 274 F.3d at 71-72. The factors to consider in determining the appropriate degree of deference include "the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense." Id. at 72. Where it appears that the plaintiff has selected the U.S. forum in an attempt to win a tactical advantage because the chosen forum's local laws favor the plaintiff's case or for other forum-shopping reasons, such as the generosity of juries in the chosen forum, the relative popularity of plaintiff and defendant in the forum, or the inconvenience to defendant, less deference is given to plaintiff's selection. Id. As the Second Circuit noted in Norex Petroleum Ltd. v. Access Indus. Inc., these factors are "not 'abrupt or arbitrary' rules;" they are to be evaluated according to "'a broader principle under which the degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale' depending on the degree of convenience reflected by the choice in a given case." 416 F.3d at 154 (quoting Iragorri v. United Techs. Corp., 274 F.3d at 71-72). (See also Pls.' Mem. at 14).

Lastly, when the choice is between a forum in the United States and one in a foreign country, a United States citizen's choice of forum in this country "is entitled to 'somewhat more deference,' as we are hesitant to deny citizens access to courts of the United States. A district court must find 'positive evidence of unusually extreme circumstances, and should be thoroughly convinced that material injustice is manifest before exercising any such discretion as may exist to deny a United States citizen access to the courts of this country." Tazoe v. Airbus S.A.S., 631

15

F.3d 1321, 1335 (11th Cir. 2011) (emphasis added) (citing <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. at 256 n.23; <u>SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A.</u>, 382 F.3d 1049, 1101 (11th Cir. 2004)).

### b) <u>Step Two - Adequate Alternative Forum</u>

The second step in the analysis is to determine whether there is an adequate alternative forum available, and the burden is on defendants to demonstrate the availability of such a forum. <u>Aguinda v. Texaco, Inc.</u>, 303 F.3d 470, 476 (2d Cir. 2002); <u>see also</u> <u>Norex Petroleum Ltd. v. Access Indus., Inc.</u>, 416 F.3d at 156-57. "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." <u>Pollux Holding, Ltd. v. Chase Manhattan Bank</u>, 329 F.3d 64, 75 (2d Cir. 2003). Therefore, determining the existence of an alternative, adequate forum "involves two inquiries . . . . Availability and adequacy warrant separate consideration." <u>Tazoe v. Airbus S.A.S.</u>, 631 F.3d at 1330 (citing <u>Aldana v. Del Monte Fresh Produce N.A.</u>, 578 F.3d 1283, 1290 (11th Cir. 2009); <u>Leon v. Million Air, Inc.</u>, 251 F.3d 1305, 1311 (11th Cir. 2001)); <u>see also</u> <u>In re Air Crash Near Peixoto de Azeveda, Brazil, on September 29, 2006</u>, 574 F. Supp. 2d 272, 282-83 (E.D.N.Y. 2008), <u>aff'd</u> 354 Fed. Appx. 585 (2d Cir. 2009).

If the party moving to dismiss on *forum non conveniens* grounds consents to the jurisdiction of an alternative forum, asserting that they are "amenable to process," the availability prong is satisfied. <u>See</u> <u>Piper Aircraft Co. v. Reyno</u>, 454 U.S. at 254 n.22; <u>see also</u> <u>Gulf Oil Corp. v. Gilbert</u>, 330 U.S. at 506-07; <u>Tazoe v. Airbus S.A.S.</u>, 631 F.3d at 1330. An agreement by the

defendant to submit to the jurisdiction of the foreign forum has generally been held to satisfy this element of the test. See Pollux Holding Ltd. v. Chase Manhattan Bank, 329 F.3d at 75; Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d at 157.

However, the defendant's agreement to be sued in the foreign forum does not resolve the question of whether that forum's courts are adequate and would permit litigation of the claims set forth in the plaintiff's complaint. While "'[t]he availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum,' nor on identical remedies," the question is whether there are reasonable alternatives under the laws of the alternative forum for the plaintiff's claims to be considered, including the availability of compensatory damages. Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d at 158. "In rare circumstances, however, where the remedy offered by the other forum is clearly unsatisfactory, the other forum may not be an adequate alternative, and the initial requirement may not be satisfied. Thus, for example, dismissal would not be appropriate where the alternative forum does not permit litigation of the subject matter of the dispute." Piper Aircraft Co. v. Reyno, 454 U.S. at 255 n.42 (internal citations omitted); see also Tazoe v. Airbus S.A.S., 631 F.3d at 1330-31.

It should be noted that the main issue is whether "there is presently available to the plaintiff an alternative forum." Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d at 159. Therefore, if the action is barred in the foreign jurisdiction by statute of limitation concerns, for example, then an adequate forum does not exist.[15] Bank of Credit & Commerce Int'l (Overseas),

---

[15]If a plaintiff, however, is precluded from litigating in a foreign jurisdiction due to an earlier foreign judgment, this consideration is not a reason for dismissal on *foreign non*

Ltd. v. Bank of Pakistan, 273 F.3d 241, 245-46 (2d Cir. 2001).

### c) Step Three - Balancing Private and Public Interests

If an adequate alternative forum is found to exist, the Court must then balance the private and public interests affected by litigating in each of the potential fora. See Iragorri v. United Techs. Corp., 274 F.3d at 73-74. "This comparative inquiry requires the district court to weigh the 'relative' advantages and disadvantages of each respective forum." Tazoe v. Airbus S.A.S., 631 F.3d at 1331 (citing Piper Aircraft Co. v. Reyno, 454 U.S. at 241 n.6; Gulf Oil Corp. v. Gilbert, 330 U.S. at 509). In essence, the court must balance the hardships that each side will suffer depending on the choice of forum. Iragorri v. United Techs. Corp., 274 F.3d at 74. Among the private interest factors to be considered are "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive." Id. (quoting Gulf Oil Corp. v. Gilbert, 330 U.S. at 508). The public interest factors to be considered include administrative difficulties for courts in congested centers, the imposition of jury duty on a community with no relationship to the litigation, and familiarity of the presiding court with the governing law. Id.

---

conveniens grounds, but rather dismissal may be warranted in the interest of international comity. Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d at 159 (citations omitted).

2) Analysis

    a) Plaintiffs' Choice of Forum

The first question for the Court to determine is what degree of deference should be given to plaintiffs' selection of this forum. In moving to dismiss, defendants contend that plaintiffs have engaged in "blatant and unabashed forum shopping," and therefore, that plaintiffs' choice of forum should be given little deference in light of the alleged "extreme inconvenience and burden" that will result to all parties, including plaintiffs, if the case is tried in New York. (Defs.' Mem. at 25, 27).

Defendants contend that plaintiffs have simply chosen to "file their spurious claims in" the Eastern District of New York in order "to cause as much inconvenience and expense to the defendants as possible" and to "take advantage of the favorable local laws and the generosity of New York juries." (Id. at 26-29). More specifically, defendants note that plaintiffs are "foreign" plaintiffs, in that none of them currently resides in, or has any connection to New York. (Id. at 26). Indeed, none of the plaintiffs ever lived in New York while they worked as Flight Engineers for NCA: Bakeer resided in Virginia and Texas (Collins Decl. ¶ 23; Bakeer Compl. ¶ 5); Weaver lived in Virginia (Collins Decl. ¶ 12; Weaver Compl. ¶ 5); Michaud lived in California (Michaud Compl. ¶ 4); and Frith lived in Australia and England for most of the time that he was employed by PARC, moving to Alaska in December of 2006. (Collins Decl. ¶¶ 16, 19; Frith Compl. ¶ 5). Therefore, defendants contend that plaintiffs' choice of forum deserves little deference.

Defendants further contend that the plaintiffs did not work in New York, but spent most of their time flying international cargo routes. (Defs.' Mem. at 26). To the extent that they did

perform some work here, "[t]hey performed only minimal duties in New York, most of which were administrative in nature" and were not their primary duties as Flight Engineers. (Id. at 29). Defendants further assert that none of the alleged discriminatory conduct occurred in New York (id.), and that nothing implicating plaintiffs' employment took place in New York; plaintiffs were not paid in New York, no employment records are located in New York, and there is no evidence, either witnesses or documents, located in New York. (Id. at 27). Furthermore, contrary to plaintiffs' assertions, defendants claim that NCA's principal place of business has always been in Japan, not in New York.[16] (Id.)

Defendants further argue that the other defendants, aside from NCA, are equally inconvenienced by the maintenance of the litigation in New York. (Id. at 28). According to defendants, HACS is a small business located in Hawaii, with no connection to New York beyond this litigation. (Id.; Bell Decl. ¶¶ 5-8). Similarly, PARC Aviation has its headquarters in

---

[16]Defendants repeatedly dispute the characterization of New York as NCA's principal place of business, stating that "all NCA did was identify JFK as its principal office in New York, not its principal office in the world." (Defendants' Reply Memorandum of Law in Further Support of Defendants' Joint Motion to Dismiss the Complaints for Forum Non Conveniens and Defendant Nippon Cargo Airlines' Motion to Dismiss the Complaints Pursuant to Federal Rule of Civil Procedure 12(b)(6), dated June 23, 2010 ("Defs.' Reply") at 6-8). Plaintiffs assert that determining a principal place of business is a question of fact, analyzed "by taking into consideration such factors as the character of the corporation, its purposes, the kind of business in which it is engaged, and the situs of its operations," which "should be resolved in plaintiffs' favor," and that "[d]espite defendants' contention to the contrary, NCA's JFK hub can constitute its principal place of business." (Pls.' Mem. at 16-17 (citing Clothier v. United Air Lines, Inc., 196 F. Supp. 435, 436 (E.D.N.Y. 1961) (holding that even though the chief executives of the airline were in New York, aircraft engineering, maintenance, flight operations, dispatch, and flight crew planning were located in Missouri, making Missouri the principal place of business); Hershel v. Eastern Airlines, Inc., 216 F. Supp. 347 (S.D.N.Y. 1963) (finding Miami to be Eastern's principal place of business because the operations department that controlled the pilots, flight attendants, flight engineers, and the other duties involved in the operation of the flights, was located there, making it the place of operation of the airline in all respects)). At this stage of the litigation, the Court lacks sufficient information to determine whether or not New York served as NCA's principal place of business, but finds in unnecessary to do so for purposes of deciding this motion.

Ireland, and PARCL is headquartered in the Channel Islands; neither entity does business in New York. (Defs.' Mem. at 28). Although defendants do concede that one of the defendants, PARC U.S., which is a subsidiary of PARC Aviation, has its principal place of business in Yonkers, New York, defendants argue that PARC U.S. served only a limited purpose, entering into employment contracts and handling administrative issues that arise with employees who are United States residents and are assigned to JFK or other United States airports. (Id.) For all of the aforementioned reasons, defendants therefore contend that the plaintiffs' choice of forum should be given little deference. (Id. at 29).

In opposing defendants' motion to dismiss for *forum non conveniens*, plaintiffs contend that their choice of forum "should be given significant deference" (Pls.' Mem. at 9 (citing 17 James W. Moore, et al., Moore's Federal Practice-Civil § 111.73 (2010))), because their reasons for selecting New York are recognized by the law as valid. (Pls.' Mem. at 14). Specifically, plaintiffs list nine main reasons why New York is a proper forum: (1) venue under Title VII is proper "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice" (id. at 15 (quoting 42 U.S.C. § 2000e-5(f)(3))); (2) venue under the ADEA is proper "in any court of competent jurisdiction for such legal or equitable relief as will effectuate the purposes of this chapter" (Pls.' Mem. at 15 (quoting 29 U.S.C. § 626(c)(1)[17])); (3) plaintiffs' employment at JFK Airport provides a bona fide connection to the forum (Pls.' Mem. at 15); (4) defendant NCA has a physical presence in New York and is amenable to service of process here (id. at 15-17); (5) defendant PARC U.S. has its principal

_____

[17]The Court notes that plaintiffs actually cite to 19 U.S.C. § 626, but the correct citation is actually 29 U.S.C. § 626.

place of business in New York (id. at 17); (6) given that PARC U.S. handles the administrative aspects of its employment relationships in New York, plaintiffs suggest that some employment records are maintained in New York (id.); (7) the employment contracts of Bakeer, Michaud, and Weaver contain New York choice of law provisions (id.); (8) defendants PARC Aviation, PARCL, and HACS are connected to New York though their assignment of plaintiffs to JFK Airport (id. at 18); and (9) NCA, PARC Aviation, and HACS have appeared in New York for similar matters. See, e.g., Erenfryd v. Nippon Cargo Airlines Co., Ltd., No. 06 CV 0165 (E.D.N.Y. Jan. 13, 2006),[18] and Steffanson v. Nippon Cargo Airlines Co., Ltds., No. 09 CV 5216. (See Pls.' Mem. at 18).

Plaintiffs further dispute defendants' claim that their choice of forum should be afforded little deference simply because plaintiffs are not residents of New York. Plaintiffs rely on the statement of the Second Circuit in Iragorri that "where a U.S. resident leaves her home district to sue the defendant where the defendant has established itself and is thus amenable to suit, this would not ordinarily indicate a choice motivated by desire to impose tactical disadvantage on the defendant." (Pls.' Mem. at 18 (quoting 274 F.3d at 73)). See also Wesoke v. Contract Servs., Ltd., No. 00 CV 1188, 2002 WL 1560775, at *5 (S.D.N.Y. July 15, 2002). Therefore, since each plaintiff is a United States resident, even though New York is not their home forum, under Iragorri, the Court must consider the other factors that may have led plaintiffs to select New York. These factors include the convenience to plaintiffs, the availability of evidence and

---

[18]The Complaint from Erenfryd was submitted to the Court as Exhibit B to the Declaration of Keri L. Reid, Esq. in Support of Defendants' Motion to Dismiss ("Reid Decl., Ex. B").

witnesses, defendants' amenability to suit here, and other inappropriate reasons that may have come into play in plaintiffs' decision to file suit in New York, such as the inconvenience to defendants. Furthermore, as already noted, when the choice of forum is between one in the United States and one in a foreign country, a United States citizen's choice of forum in this country is entitled to significant deference, "as we are hesitant to deny citizens access to courts of the United States." Tazoe v. Airbus S.A.S., 631 F.3d at 1335 (citing Piper Aircraft Co. v. Reyno, 454 U.S. at 256 n.23; SME Racks, Inc. v. Sistemas Mecanicos Para Electronica, S.A., 382 F.3d at 1101).

One key factor that suggests that deference should be afforded to plaintiffs' choice of forum is the fact that the employment contracts of three of the plaintiffs[19] contain New York choice of law provisions. (Pls.' Mem. at 11 (citing Bakeer Compl., Ex. A[20] ¶ 13; Weaver Compl., Ex. A[21] ¶ 13; Michaud Compl., Ex. A[22] ¶ 10)). The contracts containing the New York choice of law provisions, which Weaver and Bakeer negotiated with PARC U.S., and which

---

[19]Plaintiff Frith's employment contract contains a Bailiwick of Jersey choice of law provision. (See Frith Compl., Ex. A ¶ 13). The Court notes that it is unclear, based on the actual agreement, whether it is "Between Parc Selection Limited and Mr. Doug Frith" as listed on the cover page or between Mr. Frith and PARCL, who is listed as the second party in the text of the actual agreement. Regardless, neither of those two entities are located in the United States or in Japan.

[20]Citations to "Bakeer Compl., Ex. A" refer to the Agreement Between PARC U.S. and Bakeer, signed by PARC U.S. on February 24, 2004 and by Bakeer on April 12, 2004, and submitted as Exhibit A to the Bakeer Complaint.

[21]Citations to "Weaver Compl., Ex. A" refer to the Agreement Between PARC U.S. and Weaver, signed by Weaver on July 2, 2007, and submitted as Exhibit A to the Weaver Complaint.

[22]Citations to "Michaud Compl., Ex. A" refer to the Employment Agreement between HACS and Michaud, signed by Michaud on February 21, 2007, and submitted as Exhibit A to the Michaud Complaint.

Michaud negotiated with HACS, were clearly agreed to by PARC U.S. and HACS.

In arguing that the existence of these choice of law provisions is a particularly compelling factor in support of their choice of forum, plaintiffs rely in part on the court's determination in Brain v. Nippon Cargo Airlines Co., Ltd.,[23] in which the plaintiffs, pilots formerly employed by NCA, PARC Aviation, and HACS, who were assigned to NCA's On-Line Point in San Francisco, brought suit claiming wrongful termination based on race, national origin, and age. In denying defendants' motion to dismiss for *forum non conveniens*, the court in Brain considered whether Japan was a suitable alternative forum[24] and ultimately determined that consideration of the public and private interests made it more appropriate to have the matter tried in California. Brain v. Nippon Cargo Airlines Co., Ltd. at 3. Among other things, the court emphasized that the choice of law provision in the employment contracts called for the application of New York law, which the court concluded "would be foreign to Japan," not only because it is the law of a foreign place, but also because the law would be written in a foreign language and would be subject to foreign authorities. Id. at 4. Citing the Brain court's finding that a California court was better equipped than a Japanese jurist to interpret New York law, plaintiffs argue that this factor is even more compelling where the choice is to have a New York jurist interpret New York

---

[23]Citations to Brain v. Nippon Cargo Airlines Co., Ltd. ("Brain"), refer to a transcript from a proceeding held on September 17, 2009, before the Honorable Richard A. Kramer, Superior Court of California, County of San Francisco (Docket No. 08-476169), a copy of which was submitted as Exhibit 1 to Plaintiffs' Memorandum of Law. In addition to NCA, PARC Aviation and HACS were also named as defendants in that case.

[24]Defendants assert that the court in Brain "already determined that Japan is an available appropriate alternative forum." (Tr. at 9-10). Regardless, as plaintiffs' counsel noted during the oral argument, the Brain court's comment that Japan might be an adequate forum was mere dicta and the court, in the end, still denied the defendants' motion to dismiss for *forum non conveniens*. (Id. at 19, 21).

law. (Pls.' Mem. at 10-11, 21).

Defendants respond that "a choice of law clause 'is not the equivalent of a choice of forum clause' in the *forum non conveniens* analysis," and note that "federal courts have not hesitated to entrust the application of American law to foreign courts when dismissal for *forum non conveniens* was otherwise justified." (Defs.' Reply at 9-10 (internal citations omitted)). Regardless, neither of these assertions precludes the Court from considering the choice of law clauses, in conjunction with all the other factors mentioned herein, as weighing in favor of respecting plaintiffs' choice of forum.

Plaintiffs' argument is further buttressed by the fact that, as already mentioned, one of the defendants, PARC U.S., which was principally responsible for negotiating both Weaver's and Bakeer's employment contracts, has its principal place of business in Yonkers, New York. (See Tr. at 20, 24). Indeed, NCA actively attempts to distance itself from the employment agreements, repeatedly asserting that it played no role in negotiating the agreements or in paying the plaintiffs. Therefore, plaintiffs assert that "where two of the written contracts are with PARC U.S., a New York State entity, it's hard to say how there's anything inappropriate in [giving] Plaintiffs' choice of venue . . . full, complete and appropriate deference." (Id. at 20). Defendants respond to this assertion by claiming that the existence of the PARC U.S. "Yonkers store front . . . does not change the fact that all of the decisions, all of the discriminatory conduct occurred in Japan." (Id. at 26). Plaintiffs, however, note that "to say all of the discriminatory conduct occurred in Japan is just not something we all agree with. . . . it is our contention that the decision to terminate was made in New York." (Id. at 30-31).

25

NCA further claims that New York is not an appropriate forum because NCA's activities in New York are de minimus.[25] However, plaintiffs allege that since 1984, NCA has been registered as a foreign business corporation in New York State, has had its principal executive office at JFK Airport, and that JFK Airport is where the Flight Crew Department managers and schedulers were based. (Pls.' Mem. at 15-16). According to plaintiffs, NCA's own website lists a New York branch office, with corporate offices where sales, freight handling, and flight crew administration occur. (Id. at 16; see also Carlino Decl., Ex. B[26]). Not only were NCA's 18 flight engineers and 40 pilots based out of the New York branch, but the New York branch office was staffed by NCA employees, including a chief pilot, chief flight engineer, training pilots, schedulers, an office manager, and a secretary. (Pls.' Mem. at 16). In addition, NCA maintains a 175,000 square foot cargo facility at JFK. (Id.; see also Carlino Decl., Exs. B-E).

Taking all of these factors into account, it appears that defendants PARC U.S. and NCA clearly have a New York presence. Furthermore, all four plaintiffs were assigned to JFK Airport as their On-Line Points, and while they may not have resided in New York, JFK Airport appears to have been the hub of their employment relationship with defendants; it was where they received their assignments, landed, refueled, and took on crew. (Ikeda Decl. ¶¶ 28, 34, 39, 44).

---

[25]The Court notes that the issue at hand is not whether New York is the location to which defendants have the most significant connection or whether New York is the most convenient forum for defendants. The inquiry here is which venue has "a superior interest in resolution of these claims." Tazoe v. Airbus S.A.S., 631 F.3d at 1334. As discussed below, the Court must consider whether New York is a location with a sufficient connection to this case, not to the defendants in general, to warrant litigation here, or whether the plaintiffs' choice of forum should be overruled because Japan is a more convenient and appropriate forum with a more "paramount" interest in this litigation.

[26]Citations to "Carlino Decl., Ex. B" refer to a printout from the NCA website, listing NCA's worldwide offices, including its New York branch in Jamaica, N.Y.

Indeed, defendants concede that JFK Airport is where NCA's planes "take off from, land at, deliver cargo, load cargo, and refuel" and that each plaintiff has "a locker room for them to go to store things," that plaintiffs pick up assignments and schedules at their On-Line Points, and that "[t]hey did stay overnight" here. (Defs.' Mem. at 3; Tr. at 8).

Defendants, however, contend that "that is not sufficient a connection to tie this entire case and have it tried in the Eastern District of New York." (Tr. at 8). Defendants argue that plaintiffs spent more time in the air than at JFK and that "what occurs at JFK . . . is incidental to their job." (Id. at 7-8).[27] However, as plaintiffs note, the place where they began and ended their work assignments, received their assignments, orders, equipment, cargo, and other crew members is "hardly irrelevant," and "it is difficult to comprehend what kind of activity could be more significant" in the aviation business.[28] (Pls.' Mem. at 15). Furthermore, defendants have not shown, or even alleged, that the plaintiffs have any greater connection to Japan than they do to

---

[27]Defendants also contend that NCA "has no more connection to New York than it does to any other location where it has an On-Line Point" (Defs.' Reply at 6), and that "while NCA flies to and from every other hub in the United States on a daily basis, it only flies to New York twice weekly." (Id. at 8). Whether NCA flies to New York twice a week or not remains unclear, as defendants' counsel, during the oral argument, first indicated that "I believe it was less than twice a week that plaintiffs had to come here," but only a few lines later said, "I can say that I am aware that they were flying into New York at least twice a week and that they did stay." (Tr. at 28).

[28]Defendants respond to this assertion by stating that "FLYING is the most important aspect of NCA's air cargo business. Plaintiffs were hired to assist in flying planes; their place of employment was the cockpit of those planes." (Defs.' Reply at 6 (emphasis in original); see also Tr. at 7-8). Defendants have also asserted that "[a]s far as the time spent in the air . . . there is case law that suggests you should look, in pilot cases, to how much time is spent in the air. Where are they, are they inside the United States or are they in international airspace, in determining where their place of employment was." (Tr. at 28). However, defendants have not provided the Court with any such case law, nor have defendants provided any information that would allow the Court to make that type of analysis to see where plaintiffs spent the majority of their flying time. Surely, defendants cannot be suggesting that plaintiffs' primary place of employment, where they "spent most of their working hours," is in the air (Defs.' Reply at 8), and that therefore, there is no physical location that can serve as a proper forum for the litigation of plaintiffs' employment discrimination claims.

New York.

For all of the aforementioned reasons, the Court finds that plaintiffs' choice of this forum should be accorded significant deference.

### b) Japan as an Adequate Alternative Forum

The Court next considers whether there is an equally adequate alternative forum that might be better suited for this litigation.

Defendants contend that Japan is an adequate alternative forum in which to try this case. (Defs.' Mem. at 29-35). Defendants note that they are all amenable to service in Japan, they would all agree to waive any statute of limitations defenses that they may have, and they will all make their witnesses available in Japan. (Id. at 30; see also Collins Decl. ¶¶ 37-38; Bell Decl. ¶ 23; Ikeda Decl. ¶ 57). Although the defendants' willingness to be sued in the foreign forum resolves the question of whether defendants are amenable to service in Japan and also whether the forum is available, it does not resolve the question of whether Japanese courts would permit litigation of the claims set forth in the plaintiffs' Complaints, a necessary factor in determining if an alternative forum would be adequate.

In support of their argument that plaintiffs will not be prejudiced if the case is tried in Japan, defendants have presented the Declaration of Kasei Okumura, an attorney licensed to practice law in the courts of Japan and a lawyer with the Tokyo law firm of Okuno & Partners. (Okumura Decl.[29] ¶¶ 1, 7). Ms. Okumura became a registered attorney with the Tokyo Bar

--------------------------------------------

[29]Citations to "Okumura Decl." refer to the Declaration of Kasei Okumura in Support of Defendants' Motion to Dismiss the Complaints for *Forum Non Conveniens*, dated April 12,

Association in October of 2002, after attending law school and the Legal Training and Research Institute of the Supreme Court of Japan in Saitama, Japan. (Id. ¶¶ 5-6). She has also earned an L.L.M. from Georgetown University Law Center and passed the New York State Bar Examination, making her familiar with both the legal system in Japan, including the Code of Civil Procedure, and the legal system in the United States. (Id. ¶¶ 8, 10).

Defendants contend that "Ms. Okumura's Declaration establishes that the Japanese legal system will provide plaintiffs with due process and a fair adjudication of their claims." (Defs.' Mem. at 31). According to Ms. Okumura, the Japanese Constitution "declares that all people are equal under the law . . ." (Okumura Decl. ¶ 14), and Article 14 of the Japanese Constitution specifically provides that: "All of the people are equal under the law and there shall be no discrimination in political, economic or social relations because of race, creed, sex, social status or family origin." (Id. ¶ 29). Furthermore, Article 3 of the Japanese Labor Standards Law prohibits discrimination in working conditions, hours, or wages based on "nationality, creed or social status of any worker . . ." (id.), and the Japanese Labor Contract Act contains a prohibition on "abusive dismissals," requiring employers to have objectively reasonable grounds for terminating employment. (Id. ¶ 31). According to Ms. Okumura, the "abusive dismissal" doctrine has been interpreted by Japanese courts as prohibiting termination based on disability and age. (Id. ¶¶ 31-33; see also Defs.' Mem. at 35).

In her Declaration, Ms. Okumura further states that under Japanese law, "a person has the right to pursue a lawsuit on a valid cause of action." (Okumura Decl. ¶ 21). In addition to filing

---

2010.

a civil lawsuit, a plaintiff dealing with employment claims has the option of pursuing a "labor trial," which is similar to an administrative hearing, in that the case is heard by a three person panel that can either recommend a settlement or render a judgment. (Id. ¶ 28). The plaintiff, if dissatisfied with the result, can then proceed to pursue a civil claim in court (id.), bringing a claim for, among other things, a breach of contract against an employer. (Id. ¶ 34). Plaintiffs who are successful in pursuing an employment claim in Japan may recover back pay and possible re-employment. (Id. ¶ 36). Defendants therefore assert that "although plaintiffs may not be able to bring the identical claims in Japan, they can bring analogous claims based on the same underlying allegations," either by "fil[ing] a civil law suit or pursu[ing] a labor trial." (Defs.' Mem. at 34).

With respect to the availability of discovery in Japan, it used to be a "common criticism" that the Japanese legal system had "inadequate opportunities to conduct pretrial discovery;" however, it appears that this view has changed since the 1998 revisions to the Japanese Code of Civil Procedure. LinkCo, Inc. v. Nichimen Corp., 164 F. Supp. 2d 203, 210 (D. Mass. 2001).[30] Ms. Okumura's Declaration explains that plaintiffs in Japan must include documentary evidence along with their complaints and that the defendants must do the same with their answer. (Okumura Decl. ¶ 22). Thereafter, "the parties engage in document exchanges, and submit

---

[30]In fact, "a number of American courts have previously recognized that while Japanese courts do not provide the full range of expansive discovery allowed in the United States, meaningful discovery is available in Japan." U.S.O. Corp. v. Mizuho Holding Co., No. 06 CV 0459, 2007 WL 2893628, at *5 (N.D. Ill. Sept. 27, 2007) (citing Lockman Found. v. Evangelical Alliance Mission, 930 F.2d 764, 768 (9th Cir. 1991) (finding that different discovery procedures than those utilized in the United States did not render Japan an inadequate forum), aff'd 547 F.3d 749, 754 (7th Cir. 2008); Abbott Labs. v. Takeda Pharm. Co., No. 05 CV 3758, 2006 WL 539341, at *4 (N.D. Ill. Feb. 24, 2006) (finding that plaintiff "would be entitled to conduct meaningful discovery in Japan")).

statements of the parties, witnesses, and briefs to the court as evidence," and apparently, if necessary, "Japanese courts have the power to issue orders (like subpoenas) compelling the production of documents and the attendance of any witnesses (including witnesses who are not a party to the lawsuit) who are required to testify." (Id. ¶¶ 23, 25). Thus, defendants contend that the Japanese legal system is sufficient in that "[l]itigants are entitled to pretrial discovery, including document exchanges, and submission of statements of the parties and witnesses." (Defs.' Mem. at 31).

While the discovery procedures available in Japan may not be coextensive with the Federal Rules of Civil Procedure, an alternative forum is generally "not considered 'inadequate' merely because its courts afford different or less generous discovery procedures than are available under American rules.'" LinkCo, Inc. v. Nichimen Corp., 164 F. Supp. 2d at 210-211 (quoting Mercier v. Sheridan Int'l, Inc., 981 F.2d 1345, 1352-53 (1st Cir. 1992)); see also Lockman Found. v. Evangelical Alliance Mission, 930 F.2d at 768 (holding Japanese forum to be adequate although discovery procedures were "not identical to those in the United States"); Goldhammer v. Dunkin' Donuts, Inc., 59 F. Supp. 2d 248, 255 (D. Mass. 1999) (noting that "the fact that there is less access to discovery in England than in federal court weighs against staying this action, but only slightly so").

Plaintiffs, however, dispute defendants' claim that Japan is an adequate forum, contending that there has been no showing that Japanese courts would permit litigation of plaintiffs' claims. (Pls.' Mem. at 18-20). Plaintiffs contend that Ms. Okumura's Declaration fails to mention any cases similar to plaintiffs' case, where non-Japanese employees have

succeeded in obtaining damages from a Japanese company based on age, race, or national origin discrimination. (Id. at 19). Nor is there any mention in Ms. Okumura's Declaration of any Japanese cases applying the federal laws – specifically, the ADEA, FMLA, Title VII, or Section 1981 – or the New York State laws that are at issue here.[31] (Id. at 19-20). During the oral argument, plaintiffs' counsel noted that "[f]or the volume of papers that the Court has before it, there are no cases that indicate that any non-Japanese citizen ever has gotten a fair or adequate hearing on any claim involving employment discrimination. There's just no indication of that," and "[i]t's not Plaintiffs' burden to demonstrate the adequacy of the remedy under Japanese law." (Tr. at 21-22).

Defendants assert that this criticism "misses[s] the point of this inquiry entirely." (Defs.' Reply at 2-3 ). Instead, defendants argue that "a finding that the forum permits litigation of the subject matter of the dispute 'does not depend on the existence of an identical cause of action in the other forum.'" (Id. (emphasis in original) (citations omitted)). Indeed, while defendants have admitted that "Japanese law does not explicitly prohibit age or disability discrimination," they argue that the "abusive dismissal" doctrine is sufficient to address those claims. (Defs.' Mem. at 34; Tr. at 10). Defendants contend that since "an adequate alternate forum does not depend on the existence of the identical cause of action in the foreign forum . . . plaintiffs will be able to fairly seek adjudication in Japan of all of the claims they have asserted." (Defs.' Mem. at 35).

---

[31]Defendants respond to this argument, in part, by noting that "Defendants have made no concession that United States federal and state employment discrimination laws apply to the plaintiffs in these cases, whether the cases are tried here or in Japan, and NCA has vigorously argued in its motion to dismiss that Title VII, § 1981, the ADEA, the FMLA, and the New York State and City Human Rights Laws do not even apply to plaintiffs' claims." (Defs.' Reply at 10). Despite defendants' position on the applicability of U.S. law, the Court must independently consider whether the alternate forum could properly adjudicate plaintiffs' claims.

Regardless, it is still defendants' "heavy burden" to actually prove that the subject matter of plaintiffs' claims can be adequately addressed in the alternate forum, Sinochem Int'l Co., Ltd. v. Malaysia Int'l Shipping Corp., 549 U.S. at 423, and here, defendants have failed to provide any cases demonstrating that similar claims have been litigated in Japan. The cases cited by defendants in their attempt to demonstrate that Japan is an adequate forum (Defs.' Mem. at 32), did not deal with discrimination claims and are distinguishable for other reasons. See, e.g., Borden, Inc. v. Meiji Milk Prods. Co., Ltd., 919 F.2d 822 (2d Cir. 1990). For example, in Borden, which involved claims of breach of contract and destruction of goodwill, the district court found that "all necessary fact witnesses are in Japan." Id. at 828. Plaintiffs contend that "[h]ere, U.S. citizens and residents will be affected, and plaintiffs' witnesses are located in the United States." (Pls.' Mem. at 19). Similarly, in Paterson, Zochonis (U.K.), Ltd. v. Compania United Arrows, S.A., also cited by the defendants, the contract at issue contained a Japanese forum selection clause, which is not present in any of the employment contracts at issue in this case; furthermore, no claim of discrimination was raised in that case. 493 F. Supp. 626 (S.D.N.Y. 1980). (See Defs.' Mem. at 32). "By contrast, here, . . . three plaintiffs had express New York choice of law provisions in their contracts." (Pls.' Mem. at 19). Therefore, plaintiffs assert that "defendants fail to cite any cases where the court had granted a motion to dismiss for *forum non conveniens*, in an employment discrimination matter, where Japan was found to be a suitable alternative forum." (Id. at 12, 19).

Furthermore, although defendants have submitted Ms. Okumura's Declaration, suggesting that Japanese courts may consider claims of discrimination, notably absent from her

33

statement is any mention of specific instances of claims remotely similar to the ones pursued by plaintiffs. (See id. at 19-20). Although she indicates that employees may pursue a "labor trial" against their employer for breach of contract, and then, if dissatisfied, pursue a civil claim for back pay, it is unclear from her statement whether discrimination claims, as opposed to contract claims, would be compensable by back pay. More importantly, however, is the fact that for three of the plaintiffs, defendants included choice of law provisions in their employment agreements, providing that New York law, not Japanese law, was to govern any dispute between employer and employee. Ms. Okumura notes that "Japanese Courts will apply foreign law, if the foreign law appropriately should be applied, or if the parties had agreed that the foreign law should be applied to a claim or matter." (Okumura Decl. ¶ 35). However, since Ms. Okumura's Declaration has not provided any examples of when foreign law has actually been applied, it is unclear to the Court how Japanese courts make the determination when it is appropriate to apply foreign law. More importantly, nowhere does she explicitly represent that the choice of law provisions at issue in these contracts would be followed by a Japanese court.

Having considered defendants' submissions, the Court concludes that defendants are amenable to service in Japan, would agree to waive any statute of limitations defenses, and are willing to make their witnesses available in Japan. However, despite the fact that the discovery procedures available in Japan might be considered sufficient, the Court finds that, under the circumstances here, defendants have failed to carry their "heavy burden" of showing that plaintiffs' discrimination claims are cognizable in a Japanese court or that their contractual choice of law provisions would be honored in such a litigation. In light of the fact that age and

34

disability discrimination are not explicitly prohibited by Japanese law, and given the absence of a single Japanese decision cited that deals with employment discrimination claims, the Court concludes even if Japan is an adequate alternative forum, other factors, including the choice of law provisions, weigh in favor of keeping the case here.[32]

### c) Balance of Private and Public Interests

In considering the relative private and public interests that will be affected by suit in New York, defendants argue that both the private and public interest factors weigh in favor of litigation in Japan. Specifically, defendants argue that all of the key decisions regarding plaintiffs' allegations occurred in Japan, Hawaii, or Ireland. (Defs.' Mem. at 37; see also Defs.' Reply at 8). Furthermore, defendants emphasize that none of the plaintiffs reside in New York, NCA's witnesses are all in Japan, HACS' witnesses are all in Honolulu, and PARC Aviation and PARCL's witnesses are located in either Ireland or the Isle of Jersey. (Defs.' Mem. at 37).[33]

---

[32]The Brain Court, in denying defendants' motion to dismiss for *forum non conveniens*, explained that:

> regarding whether there is an alternative forum available, I would say that there is a sufficiently available appropriate alternative forum available. The standard is not that high. In Japan, . . . is a court system that basically functions in a rational, fair way. Here we have all of the defendants agreeing to go to Japan[, but] that's not quite the same as having a forum that on its own would stand as being an appropriate place to have the action heard because conceivably the defendants could all agree to go to the island of Tobago, T-O-B-A-G-O, and that would be an appropriate forum, I guess, and then it would be that if Tobago has a rational judicial system, then the first step would be met.

Brain v. Nippon Cargo Airlines Co., Ltd. at 3-4. The Court then goes on to discuss the choice of law provisions and other factors which weighed against transferring the case to Japan.

[33]According to NCA, its relevant documents and witnesses are located in Japan. (Ikeda Decl. ¶ 24). Similarly, the PARC defendants assert that "all persons with first-hand knowledge of the employment relationships between plaintiffs Weaver and Bakeer and PARC US, other

35

Defendants further contend that all of the evidence is located in NCA's offices in Tokyo and that "most of NCA's documents" are in Japanese. (Id. (citing Ikeda Decl. ¶¶ 24, 51, 55)). Defendants also argue that because ANA is located in Japan and is not a party to this action, if the case stays in New York, plaintiffs will be unable to obtain certain proof, including documentation such as the collective bargaining agreement between ANA and the union, that is central to plaintiffs' claims that they were treated differently from their Japanese counterparts.[34] (Defs.' Mem. at 38). Since Japan is not a signatory to the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, neither ANA nor the Japanese union can be compelled to produce documents or witnesses in the United States. (Id.) The only method for obtaining the testimony of an unwilling Japanese witness is through "a letter rogatory executed

---

than administrative matters involving payroll and benefits, are residents of Ireland and work in Dublin, Ireland" (Collins Decl. ¶ 35), and "[v]irtually all documents relating to the employment of plaintiffs Weaver, Frith and Bakeer are located outside the United States." (Id. ¶¶ 35-36). However, there has been no affirmative statement from PARC U.S. itself that it has no documents or witnesses here in New York. Therefore, given that there has been no discovery in this case, the plaintiffs' choice of New York as the forum for this case does not seem to be designed to inconvenience PARC U.S. Furthermore, as one court has noted, "[i]t is a fact that plaintiffs will almost always select a forum in which they believe they will maximize their recovery, as long as they have a reasonable chance of remaining in that forum, and that forum is often within the U.S. Conversely, defendants will generally seek to relegate actions to the forum in which they believe their exposure is minimized, and that forum is often outside of the U.S." In re Air Crash Near Peixoto de Azeveda, Brazil, on September 29, 2006, 574 F. Supp. 2d at 279. No proof has been provided that leads the Court to believe that plaintiffs' forum choice was made for the purpose of causing inconvenience to the defendants or that the choice was the result of any other malicious motive, but rather, it appears the choice was based on the typical motives involved when a plaintiff chooses a forum for litigation.

[34]While NCA emphasizes that ANA, its witnesses, and documents are not available here in New York (Tr. at 13-14), plaintiffs' counsel argues that it is defendants' burden to come forward with a nondiscriminatory reason for their conduct, noting that if they cannot do this without access to ANA, "I don't fear for the consequence for the plaintiffs here." (Id. at 23). This seems to suggest that these ANA witnesses and documents are more important for defendants' defense than to plaintiffs' claims.

by a Japanese court," which defendants assert can take "six months to a year to execute."[35] (Id.) Defendants also emphasize, as Ms. Okumura stated in her Declaration, that "witnesses located outside of Japan may appear in Japanese courts via videoconference, eliminating the necessity of travel" for any of plaintiffs' supposed witnesses located in the United States. (Defs.' Reply at 4 (citing Okumura Decl. ¶ 25)).

Apart from the potential difficulty presented by the absence of a means to compel Japanese witnesses to appear in the United States, defendants argue that to litigate in New York would strain the financial resources of the parties and non-parties who control the evidence; defendants contend that "it would be significantly less expensive for NCA, HACS, and ANA to produce witnesses in Japan than" in New York. (Defs.' Mem. at 39). Defendants further argue that there will be significant translation costs incurred if the litigation remains in the United States, as many of the documents are in Japanese.[36] (Id.) In summary, defendants assert that the private interests, particularly the inability to compel critical testimony and documentary

---

[35]During the oral argument, defendants' counsel commented that: "from personal experience" it is "extremely difficult" to obtain "the depositions of Japanese nationals . . . There is no compulsion that we can use to make anyone in Japan to appear for a deposition." (Tr. at 16). According to counsel, depositions may only be held at either the U.S. Embassy in Tokyo or Osaka and when he checked two months ago, there was a ten-month wait to take depositions in Japan. (Id.) However, when counsel was asked by the Court whether it would be any easier to obtain these depositions if the case were moved to Japan, counsel responded, "I'm not sure, Your Honor." (Id. at 16-17). Although counsel indicated that he would attempt to find out the answer, no additional information has been provided to the Court since the oral argument. (Id. at 17). Therefore, as the Court noted at oral argument, if defendants "can't compel witnesses whether it's an American case or a Japanese case, no matter what, that factor, it seems to me, evens out in terms of the balance." (Id.) The Court cannot conclude that it will be any easier to obtain witness testimony if this case is moved to Japan and therefore issues regarding witness availability do not support transferring this case to Japan.

[36]Defendants have not specified the types of documents to which they are referring, so it is unclear whether any of them may have already been translated for use in the Brain, Erenfryd, or Steffanson cases.

evidence, "render[s] Japan a more convenient forum."[37] (Id. at 38).

As for the public interest factor, defendants point to the Eastern District of New York as "a 'congested center' of litigation in the United States" and assert that "the impact of the alleged discriminatory conduct was not 'felt' in New York, as none of the plaintiffs reside in New York." (Id. at 40-41 (internal citations omitted); see also Defs.' Reply at 8). Defendants argue that this factor is further aggravated by the fact that there are numerous other fora, such as Hawaii, California, Virginia, and Japan, that defendants assert each have a greater connection than New York to the underlying events.[38] (Defs.' Mem. at 40-41).

Defendants further contend that the plaintiffs' claims under the NYSHRL and NYCHRL do not apply to foreign corporations and therefore, NCA, PARC Aviation, and HACS can only be held liable under these laws "if the discriminatory acts alleged were conceived of or implemented by New York-based personnel." (Id. at 41 (citing Sorrentino v. Citicorp, 302 A.D.2d 240, 755 N.Y.S.2d 78 (1st Dep't 2003); Iwankow v. Mobil Corp., 150 A.D.2d 272, 541

---

[37]To support this proposition, defendants refer to two slip opinions, in Jackson v. American University in Cairo and Kinney v. Occidental Oil & Gas Corporation. (Defs.' Mem. at 38; Defs.' Reply at 10). However, defendants have failed to provide sufficient citation information for these cases and have not provided the Court with copies of the opinions, as required when citing a slip opinion. Since the Court has been unable to locate these opinions, these cases have not been considered.

[38]Although Hawaii is where HACS is headquartered and thus perhaps an appropriate forum for the one plaintiff, Michaud, who was employed by HACS, defendants fail to explain why this forum would be appropriate for the other plaintiffs. Furthermore, defendants have failed to explain why the other listed fora have any greater connection to the events, apart from the fact that two of the plaintiffs reside in either California or Virginia and received their payroll checks and termination notices there. Again, however, it is not clear why Virginia or California would be appropriate fora for the other plaintiffs who do not reside in those states, nor have defendants explained why Texas and Alaska are not on this list, as the other two plaintiffs resided and received termination notices in those states. More importantly, it is unclear why any of these fora, aside from Hawaii and Japan, would be convenient for defendants or whether any of the defendants, aside from HACS, have had any presence in or connection to any of these other locales, except for Japan.

N.Y.S.2d 428 (1st Dep't 1989))). Defendants also argue that American employment laws do not apply extraterritorially to NCA in Japan, requiring the Court to instead apply aspects of Japanese employment and labor law. (Defs.' Mem. at 41-42). Finally, defendants argue that if the case proceeds to trial, the court must apply Japanese laws concerning employment status and collective bargaining units to analyze ANA's agreement with its Japanese Flight Engineers and its impact on plaintiffs' claims that they were discriminated against as compared to their Japanese counterparts. (Id.; Defs.' Reply at 11). Therefore, defendants assert that the public interest also favors moving this case to Japan.

In response to defendants' arguments that both the private and public interests weigh in favor of litigation in Japan, plaintiffs raise a number of counter-arguments. With respect to the private interests at issue, plaintiffs dispute the claim that the decisions underlying plaintiffs' complaints occurred in Japan. (Pls.' Mem. at 20-21). Instead, plaintiffs argue that the discriminatory conduct took place at NCA's JFK On-Line Point. (Id. at 21; see also Tr. at 30-31). Although plaintiffs do not elaborate further as to what conduct they are referring to, they do note that New York was where plaintiffs attended scheduling meetings, received their flight assignments, and obtained mail and uniforms. (Pls.' Mem. at 22). Plaintiffs also allegedly "spent significant amounts of time in New York, including over-night stays. Plaintiffs' work began and ended in New York." (Id. at 25). Plaintiffs also note that "[t]he full breadth of plaintiffs' connections with New York will be more fully established during discovery, which has not yet begun." (Id.) Furthermore, plaintiffs again point to the defendants' inclusion of New York choice of law provisions in Michaud's, Weaver's, and Bakeer's contracts, arguing that,

consistent with the holding in Brain, these choice of law provisions, requiring an analysis of New York law, favor venue in New York. (Id. at 11, 21).

Plaintiffs also dispute defendants' claim that New York is not actually convenient for the plaintiffs, asserting that "clearly New York is more convenient for plaintiffs than Japan." (Id. at 22). Moreover, plaintiffs take issue with defendants' claim that all of the witnesses and documents are located in Japan, pointing out that, since New York is where the plaintiffs received assignments and attended meetings, not only are there witnesses in New York, but that there may be documents here as well. (Id.) Defendants respond that this "assumption is speculative and based neither on plaintiffs' personal knowledge nor on any of the supporting declarations submitted by defendants. In fact, it is contradicted repeatedly by defendants' declarations." (Defs.' Reply at 5-6). Plaintiffs, however, contend that in the Brain litigation, NCA identified only one Japanese citizen who was knowledgeable about the terms of the pilots' employment; plaintiffs likewise believe that there may be only one NCA witness from Japan – possibly the same witness – who will testify as to the Flight Engineers' employment in this case. (Pls.' Mem. at 23). Defendants dispute this assertion, noting that NCA "has never represented that Ikeda was the only witness in Japan" and asserting that "he is by no means the only relevant and necessary witness in this matter." (Defs.' Reply at 5).

Plaintiffs further contend, contrary to defendants' assertions, that many of plaintiffs' own witnesses are non-Japanese employees who worked for NCA in New York and are likely still residing in the United States. (Pls.' Mem. at 22). The cost and time required for these witnesses to travel to Japan would pose a great hardship for them. (Id.) Defendants, however, continue to

40

dispute the existence of witnesses in the United States with any information of "consequence in this litigation," stating "unequivocally that all witnesses with knowledge concerning plaintiffs' employment were located in Japan, Ireland, and Hawaii." (Defs.' Reply at 5 (emphasis in original)). Defendants further assert that "plaintiffs have not identified or described a single witness of theirs or of defendants who currently resides in New York." (Id. (emphasis in original); see also Tr. at 11). However, as the Court noted during oral argument, "certainly Plaintiffs themselves would be witnesses that would have to travel to Japan." (Tr. at 12). In response, defendants' counsel asserted that "[t]heir traveling to Japan should only be limited to having to do a deposition and the trial. We, on the other hand, would have to bring numerous other witnesses other than the plaintiffs for these depositions." (Id.)

Regardless, plaintiffs argue that because NCA still maintains its JFK On-Line Point and flies here regularly, it is easier for defendants to make witnesses and evidence available in New York, than it would be for plaintiffs to make their witnesses and evidence available in Japan. (Pls.' Mem. at 11, 23 (quoting Brain v. Nippon Cargo Airlines Co., Ltd. at 5 (finding that "defendant . . . an airline can move people and documents around probably more readily than could an ordinary citizen"[39]))). Defendants' counsel, at oral argument, responded to this assertion by stating that:

> There's still a cost associated with disrupting the Defendants' business and the non-party's business. The mere fact that you're an airline and can fly someone from Japan doesn't negate the fact

---

[39]Defendants criticize plaintiff's citation to Brain and the suggestion made therein that it would be easier for NCA to move individuals and evidence around than it would be for plaintiffs, noting that this was "simply an off-the-cuff observation by Judge Kramer" and that it "was 'not a major factor,' but just one of the many private interest factors considered." (Defs.' Reply at 3). The Court agrees that this is just one of the factors to be considered.

41

> that that flight takes 13 hours and you would have a witness who is
> going to be out of commission working for that company for a
> three or four day period just for one deposition; and were talking
> about numerous witness[es] that may have to come.

(Tr. at 14-15). Defendants also note that this consideration does not apply to the other

defendants, who "simply supply flight crews to airlines, but do not themselves own or operate

aircraft[s]." (Defs.' Reply at 4). However, as plaintiffs note, those defendants are "going to be

transporting their witnesses wherever they have to go whether it be in New York or Japan." (Tr.

at 15).

With respect to the travel that would be required by the plaintiffs if this litigation were

moved to Japan, the farthest trip is for plaintiff Weaver, who lives in Virginia. For plaintiffs

Frith, who lives in Alaska, and Bakeer, who lives in Texas, New York is still a much closer

forum than Japan.[40] "Because 'plaintiffs and defendants reside in different countries, any forum

will be inconvenient for someone.'" In re Air Crash Near Peixoto de Azeveda, Brazil, on

September 29, 2006, 574 F. Supp. 2d at 285 (quoting International Equity Inv., Inc. v. Cico, 427

F. Supp. 2d 503, 506 (S.D.N.Y. 2006)). Where both parties will suffer inconvenience in the

potential fora, the courts have held that plaintiffs' choice of forum should prevail. See, e.g.,

Wesoke v. Contract Servs., Ltd., 2002 WL 1560775, at *5; see also Iragorri v. United Techs.

Corp., 274 F.3d at 75. Furthermore, as the court in Brain noted, domestic travel within the

United States is easier and less expensive than international travel, Brain v. Nippon Cargo

Airlines Co., Ltd. at 5, 10, and therefore, traveling to New York, as opposed to Japan, is

---

[40]David Michaud, during the relevant period, resided in California, and presumably his
wife, who brings this claim as the administratrix of his estate, still resides in California, which is
also closer to New York than to Japan.

significantly more convenient for plaintiffs.

Defendants, however, respond by stating that the plaintiffs, who "are accustomed to frequent international travel, would be no more inconvenienced by maintaining these actions in Japan than they were by their prior employment." (Defs.' Reply at 4). This argument is illogical. The fact that the plaintiffs have flown regularly in the past as part of their employment and are accustomed to doing so, does not in any way eliminate the time or cost that would be expended by them in traveling to Japan for this litigation.

With respect to the inconvenience to the other defendants, as noted, PARC U.S. has an office in New York, making New York a convenient venue, and although HACS, PARC Aviation, and PARCL are not located in either Japan or New York, travel to New York, with its proximity to three major international airports, is no more inconvenient than travel to Japan. Although HACS, located in Hawaii, is geographically closer to Japan, with respect to PARC Aviation, located in Ireland, and PARCL, located in Channel Islands, New York is somewhat closer than Japan. Given NCA's repeated assertion that plaintiffs' contracts were with these entities and not with NCA, the witnesses and evidence from these defendants are critical. Furthermore, if, as NCA argues, the agreements were not negotiated with NCA, and much of the other relevant conduct did not involve NCA, it is unclear why the witnesses and evidence, particularly relating to the plaintiffs who entered into agreements with PARC U.S., would end up in Japan.

In responding to defendants' claim that the cost of translating Japanese language documents favors a Japanese venue, plaintiffs contend that in fact, many of the critical

43

documents are in English, including memoranda, policies, and manuals which were given to the flight crew in English. (Pls.' Mem. at 24). Furthermore, any documents that are in Japanese will need to be translated for review by the non-Japanese parties in the case, irregardless of whether the case is tried in the United State or in Japan. (Id.) Also, as plaintiffs note, "[a]ny documentation that does require translation from Japanese to English can just as easily be translated within the United States, as it can in Japan." (Id.) Thus, the Court finds that the cost of translation does not favor one forum over the other.

With respect to public interest concerns, defendants argue that this Court's congested docket and the burden on jurors in this district, who they assert have not felt the impact of the discriminatory conduct in New York, favors Japan as the forum. (Defs.' Mem. at 40-41). Plaintiffs respond that defendants have not provided any evidence upon which the Court could evaluate the relative congestion of the litigation dockets in New York and Japan or the speed at which plaintiffs' cases could be heard in Japan, apart from the representation that there is at least a 10 month wait for depositions in Japan.[41] (Pls.' Mem. at 20, 25). In fact, defendants' counsel admitted that "I don't have any studies for this effect," but asserted that "I think it's fair to say . . . the Eastern District has a very busy docket." (Tr. at 15 (emphasis added)). The Court agrees with plaintiffs that defendants' conjecture to this effect is insufficient to meet the defendants' burden and finds that "there are no 'administrative burdens flowing from court congestion,' because this Court can accommodate th[is] case[] on its calendar." In re Air Crash Near Peixoto

_____

[41]Furthermore, the Court notes that this motion was briefed and argued before the recent earthquake and tsunami struck Japan on March 11, 2011. At this time, the Court has no way of evaluating the possible effect that this tragedy may have on the operation of the Japanese court system and whether the speed at which cases are now being heard has been affected.

44

de Azeveda, Brazil, on September 29, 2006, 574 F. Supp. 2d at 288 (quoting Peregrine Myanmar Ltd., v. Segal, 89 F.3d 41 (2d Cir. 1996)).

Moreover, as NCA and PARC U.S. continue to operate in New York and to employ people in New York (Pls.' Mem. at 25), the Court disagrees with defendants' assertion that "there would be an imposition on juries in this community and that there is no "interest by the community" implicated here to warrant "wanting to decide this controversy." (Tr. at 15). A New York jury will appreciate the significance of JFK Airport as an international hub and its importance to people employed in New York and will further understand "the importance of enforcing anti-discrimination laws between employer and employees," even if they do not reside in this district.[42] (Pls.' Mem. at 25). Furthermore, a New York "jury has an interest in ensuring that defendants' unlawful actions do not continue," particularly given the NCA employees who do work at JFK Airport. (Id.) Also, even if the defendants could prove that the "local interest in this matter" was somewhat stronger in Japan than it is in New York, this case is "not so unrelated

---

[42]The Court notes that NCA's argument in moving to dismiss plaintiffs' claims that it was not plaintiffs' employer further deflates their arguments that this case should be moved to Japan. While, defendants point out that Judge Kramer, in Brain, "repeatedly emphasized that Japan 'would of course have an interest in its citizens, such as the airline and its employment practices,' and 'there is clearly a connection with Japan,'" (Defs.' Reply at 12), defendants fail to note that the court in Brain continued by stating that:

> I think if the pilots were Japanese citizens, then I would say yea, Japan has a strong interest in figuring out what its airlines could do with its pilots, but the way the issue comes up when they're not Japanese citizens is does Japan have an interest in what its airline does to non-Japanese citizens in other places? And it becomes less compelling, in my view, when you look at it that way. . . . And let's not forget, we have non-Japanese defendants here, too.

Brain v. Nippon Cargo Airlines Co., Ltd. at 14. The Brain court also went on to note that where the Japanese airline is not the employer, it is unclear that "the Japanese court system would have an interest" in the case. Id. NCA therefore cannot rationally argue both that they are not plaintiffs' employer and that, as a company based in Japan, Japan has a stronger interest in the case than the United States.

45

to the U.S. that it would be unfair to burden its citizens, in the district[] in which thi[is] cases w[as] commenced, with jury duty on this matter." In re Air Crash Near Peixoto de Azeveda, Brazil, on September 29, 2006, 574 F. Supp. 2d at 288.

With respect to the need to evaluate conflict of law issues and apply foreign law, both the court in Japan and this Court would be required to undertake such an analysis. Given the New York choice of law provision in three of the four contracts and the federal and state statutory claims asserted by the plaintiffs, this Court, which handles these types of claims on a daily basis, is more familiar with, and therefore better equipped to apply, the governing law, than a court in Japan.

In fact, as plaintiffs note (Pls.' Mem. at 25 n.4), this Court has been[43] handling another similar discrimination suit, Steffanson v. Nippon Cargo Airlines, Co., Ltd., 09 CV 5216, filed in this district on November 30, 2009, brought by a former pilot against NCA, PARC Aviation, and PARC Selection Limited, Inc., an alleged alter ego of PARC Aviation, with its principal place of business in the Isle of Man. (Steffanson Compl. ¶ 3). Not only were some of the defendants in Steffanson also defendants in the current case, but many of claims and facts overlap as well. Indeed, defendants NCA and PARC Aviation were each represented by the same counsel in Steffanson as they are in this case, and counsel for PARC Selection in Steffanson was the same counsel representing PARC U.S., PARC Aviation, and PARCL in this case.

Furthermore, it does not appear that the parties in Steffanson had any greater connection

---

[43]On June 27, 2011, the parties in Steffanson, with the supervision of this Court, entered into an agreement to resolve that case. Thus, this Court is intimately familiar with a number of the issues that may come into play in the current cases.

to New York than the parties in this case. In fact, the plaintiff, Mr. Steffanson, is an Icelandic citizen who lives in Spain, and although he was assigned to the JFK On-Line Point, it does not appear that he ever resided in the United States. (Id. ¶¶ 5, 17). [44]

Accordingly, under the three step analysis described by the Second Circuit in Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d at 146, the Court finds that: 1) plaintiffs selected New York for legitimate reasons, relating in large part to the New York choice of law provisions in three of the employment agreements, and thus, even though plaintiffs are not residents of New York, their choice of forum is to be given significant deference; 2) even if Japan is considered to be an adequate alternative forum, the private and public interests, including the convenience of witnesses and parties, familiarity of the courts with the legal issues, and the impact on the community all favor litigation in New York.

Although the defendants clearly contemplated the possibility of litigation in New York, as evidenced by their inclusion of New York choice of law provisions in three of the employment agreements, the Court recognizes that Mr. Frith, who is not an American citizen, and whose contract contains a Jersey choice of law provision, has a less persuasive argument for New York as the forum. Nonetheless, given that the issues raised by the other three Complaints are virtually identical to those raised by plaintiff Frith, and certainly some, if not many, of the witnesses will

---

[44]Given the similarities in the cases, it is unclear why the concerns raised by defendants in the instant cases regarding convenience were not raised in Steffanson. Furthermore, in Erenfryd v. Nippon Cargo Airlines Co., Ltd., 06 CV 165, filed in this district on January 13, 2006, plaintiff was both a citizen and resident of Argentina, and he, like Steffanson and the plaintiffs in this case, brought claims under the NYSHRL and the NYCHRL. No motion to dismiss for *forum non conveniens* was ever filed in that case, which also eventually settled. Moreover, both NCA and plaintiffs were represented in Erenfryd by the same counsel representing plaintiffs here and in Steffanson.

be the same, the Court respectfully recommends that defendants' motion to dismiss for *forum non conveniens* be denied as to all four plaintiffs.

## B. Motion to Dismiss For Failure to State a Claim

Defendant NCA[45] also moves to dismiss the Complaints pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the grounds that plaintiffs have failed to adequately allege specific facts necessary to state "plausible claims of discrimination." (Defs.' Mem. at 43-44 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).

When deciding a motion to dismiss a complaint for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6), the Second Circuit has stated that a court must "accept as true the factual allegations of the complaint, and draw all inferences in favor of the pleader." Mills v. Polar Molecular Corp., 12 F.3d 1170, 1174 (2d Cir. 1993); see also Gorman v. Consol. Edison Corp., 488 F.3d 586, 591-92 (2d Cir. 2007). In addition, the court must give plaintiff's claims "a liberal construction." Johnson v. New York City Transit Auth., 639 F. Supp. 887, 891 (E.D.N.Y. 1986) (citing Haines v. Kerner, 404 U.S. 519, 520-21 (1972)), aff'd in part and vacated in part on other grounds, 823 F.2d 31 (2d Cir. 1987). However, the court is not required to accept the truth of legal conclusions couched as factual allegations. See Papasan v. Allain, 478 U.S. 265, 286 (1986).

---

[45]The Court notes that towards the end of the oral argument, counsel for HACS, Carl Osaki, interjected that "HACS joins in the motion to dismiss" pursuant to Rule 12(b)(6), but this is the only indication anywhere that this motion was not solely brought by NCA. (Tr. at 37). As all of the filings indicate that this is solely NCA's motion, the Court has treated it as such, but notes that its recommendations as to dismissal would apply regardless of which defendant was the moving party.

In Bell Atlantic Corp. v. Twombly and Ashcroft v. Iqbal, the Supreme Court clarified the pleading standards under which courts are to evaluate a motion to dismiss, "arguably shift[ing] pleading standards from 'simple notice pleading' to a 'more heightened form of pleading.'" Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d 210, 215 (S.D.N.Y. 2010) (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544; Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009)). Now, when deciding a Rule 12(b)(6) motion to dismiss, the court should consider whether the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S. Ct. at 1949 (quoting Bell Atl. Corp. v. Twombly, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S. Ct. at 1949; see also Hayden v. Paterson, 594 F.3d 150, 160 (2d Cir. 2010). Under this heightened pleading standard, labels, conclusions, and mere recitation of the elements of a cause of action will not suffice. Id.; see also Bell Atl. Corp. v. Twombly, 550 U.S. at 555. Instead, a plaintiff must provide enough factual support that, if true, would "raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. at 555. However, "plausibility" does not rise to the level of probability but requires "'more than a sheer possibility that a defendant has acted unlawfully.'" Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215. "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 378 (2d Cir. 1995), cert. denied, 519 U.S. 808 (1996). Ultimately, when the well-pleaded facts

allow no more than an inference of a "mere possibility of misconduct" and the plaintiff has only alleged, rather than shown, an entitlement to relief, the federal pleading standard of Rule 8(a)(2) has not been satisfied. Ashcroft v. Iqbal, 129 S. Ct. at 1950.

Since the decisions in Iqbal and Twombly, courts and litigants have struggled with the application of the "plausibility" standard in the context of discrimination claims. Here, NCA contends that "plaintiffs have failed to state plausible claims of discrimination" (Defs.' Mem. at 44),[46] while plaintiffs argue that more "liberal notice pleading requirements are allowed in employment discrimination cases," such as this one. (Pls.' Mem. at 30) (quoting Amar v. Hillcrest Jewish Ctr., No. 05 CV 03290, 2009 WL 891795, at *6 (E.D.N.Y. Mar. 31, 2009)).

In Swierkiewicz v. Sorema N.A., which preceded Iqbal and Twombly, the Supreme Court explicitly rejected a heightened pleading standard for discrimination claims. 534 U.S. 506, 512, 514 (2002). As the court in Barbosa v. Continuum Health Partners, Inc., explained:

> The Court held that an employment discrimination complaint need not allege specific facts establishing a prima facie case of discrimination. Rather, "the ordinary [pre-Twombly] rules for assessing the sufficiency of a complaint apply."
> The Twombly court held that Swierkiewicz remains good law.

716 F. Supp. 2d at 215 (citing Swierkiewicz v. Sorema N.A., 534 U.S. at 508 and Bell Atlantic Corp. v. Twombly, 550 U.S. at 569-70). The Court in Twombly noted that "Swierkiewicz . . . simply reemphasized . . . that . . . a heightened pleading standard for Title VII cases was contrary to the Federal Rule[s]." Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215 n.40

---

[46]Although plaintiffs argue that NCA misstates the standard of review to be applied in considering a motion to dismiss an employment discrimination claim and that plaintiffs are not required to establish a prima facie case (Pls.' Mem. at 27-28), the Court notes that defendants admit that "plaintiffs are not required to meet th[e] burden [of establishing a prima facie case] to survive a Rule 12(b)(6) motion." (Defs.' Mem. at 45).

(quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 569-70).

In Fowler v. Scores Holding Co., the court attempted to reconcile the plausibility standard with the liberal pleading standards afforded discrimination claims, stating as follows:

> "The Iqbal plausibility standard applies in conjunction with employment discrimination pleading standards." Employment discrimination claims need not contain specific facts establishing a prima facie case of discrimination. Rather, an employment discrimination complaint "must include only a short and plain statement of the claim that gives the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests."

677 F. Supp. 2d 673, 679 (S.D.N.Y. 2009) (quoting Gillman v. Inner City Broad. Corp., No. 08 CV 8909, 2009 WL 3003244, at *3 (S.D.N.Y. Sept. 18, 2009) and Swierkiewicz v. Sorema N.A., 534 U.S. at 512, 514). The court further explained that "[t]his analysis does not run counter to Swierkiewicz. Here, the Court is not requiring heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Fowler v. Scores Holding Co., 677 F. Supp. 2d at 679 (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. at 547).

Therefore, in an employment discrimination case, the plaintiff is not required to set forth specific facts that establish each and every element of a prima facie case of discrimination under the framework set forth in McDonnell Douglas Corporation v. Green, 411 U.S. 792 (1973). See Bell Atlantic Corp. v. Twombly, 550 U.S. at 569 (quoting Swierkiewicz v. Sorema N.A., 534 U.S. at 508; citing Fed. R. Civ. P. 8(a)(2)). Instead, the complaint should contain "only enough facts" to state a plausible claim that also gives fair notice to the defendant of the basis for each claim. See Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215, 218 (holding that in "[r]econciling Swierkiewicz, Twombly, and Iqbal, a complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, 'the claim

must be facially plausible and must give fair notice to the defendants of the basis for the claim'" (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d at 679) (stating "an employment discrimination complaint 'must include only a short and plain statement of the claim . . . enough facts to state a claim to relief that is plausible on its face")).

### 1) Plaintiffs' Title VII and ADEA Discrimination Claims

#### a) Legal Standards

Title VII prohibits an employer from discriminating against an employee based on race, gender, and national origin. 42 U.S.C § 2000e-2. The ADEA prohibits an employer from refusing to hire, discharging, or otherwise discriminating against an employee based on age. 29 U.S.C. § 623(a)(1); see Boyle v. McCann-Erickson, Inc., 949 F. Supp. 1095, 1099 (S.D.N.Y. 1997). Under the ADEA, an employee has the burden of showing that age was either a "significant contributing factor" in the employer's decision, Lowe v. Commack Union Free School Dist., 886 F.2d 1364, 1375-76 (2d Cir. 1989), cert. denied, 494 U.S. 1026 (1990), or that it was "a determinative factor considered by the employer" in making an adverse employment decision. Boyle v. McCann-Erickson, Inc., 949 F. Supp. at 1099 (citing Hazen Paper Co. v. Biggins, 507 U.S. 604, 610 (1993)).

In analyzing a claim of race or age discrimination under Title VII or the ADEA,[47] courts

---

[47]The Court notes that the McDonnell Douglas burden shifting analysis and the elements generally required to allege a claim under the ADEA and Title VII also apply to plaintiffs' other discrimination claims, which are addressed later in this opinion. See Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 217 (noting that "Section 1981, the NYSHRL, and the NYCHRL are generally analyzed under the same evidentiary framework that applies to Title VII and ADEA claims"). Similarly, to the extent that defendant has challenged the sufficiency of plaintiffs' allegations that they were qualified for the job positions at issue, or that they were

employ the burden-shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802-03, and its progeny. <u>See</u> <u>Slattery v. Swiss Reinsurance Am. Corp.</u>, 248 F.3d 87, 91 (2d Cir. 2001), <u>cert. denied</u>, 534 U.S. 951 (2001). Thus, the plaintiff in a suit brought under Title VII or the ADEA bears the initial burden of proving a <u>prima facie</u> case of discrimination by a preponderance of the evidence. <u>See</u> <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 506 (1993) (citing <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 252-53 (1981)); <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d at 94. Once a plaintiff has established a <u>prima facie</u> case of race or age discrimination, the burden then shifts to the employer to establish a non-discriminatory reason for the employment decision. <u>See</u> <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. at 252-53. The final burden is then placed back on the plaintiff to prove that the defendant's proffered reason was pretextual and that defendant discriminated against the plaintiff. <u>Id.</u> at 253; <u>Slattery v. Swiss Reinsurance America Corp.</u>, 248 F.3d at 95; <u>see also</u> <u>Reeves v. Sanderson Plumbing Prods., Inc.</u>, 530 U.S. 133, 143 (2000).

Generally, to establish a <u>prima facie</u> case of national origin or age discrimination, a plaintiff must show that he was (1) a member of a protected class; (2) was qualified for the position; (3) suffered an adverse employment action; (4) under circumstances giving rise to an inference of discrimination based on membership in the protected class. <u>Barbosa v. Continuum Health Partners, Inc.</u>, 716 F. Supp. 2d at 215; <u>see also</u> <u>Carlton v. Mystic Transp., Inc.</u>, 202 F.3d 129, 134 (2d Cir. 2000), <u>cert. denied</u>, 530 U.S. 1261 (2000); <u>Chambers v. TRM Copy Ctrs.</u>

---

similarly situated to their comparator employees, the Court's analysis with respect to the Title VII and ADEA claims applies equally to all of plaintiffs' discrimination claims. (<u>See</u> discussion, <u>infra</u> at 55-64).

Corp., 43 F.3d 29, 37 (2d Cir. 1994); accord McDonnell Douglas Corp. v. Green, 411 U.S. at 802

(explaining that a prima facie case is made out under Title VII "by showing (i) that [plaintiff]

belongs to a racial minority; (ii) that he applied and was qualified for a job for which the

employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv)

that, after his rejection, the position remained open and the employer continued to seek

applicants from persons of complainant's qualifications"). Courts analyze "ADEA claims within

the same framework as Title VII," Guerra v. Jones, No. 08 CV 0028, 2010 WL 986403, at *7

(N.D.N.Y. Mar. 17, 2010) (citations omitted), with the only difference being that the protected

group is based on age as opposed to race. See McDonnell Douglas Corp. v. Green, 411 U.S. at

802.

The requirements for establishing such a prima facie case, however, are "minimal," St.

Mary's Honor Ctr. v. Hicks, 509 U.S. at 506; accord Austin v. Ford Models, Inc., 149 F.3d 148,

152 (2d Cir. 1998), and courts in this circuit have held that "the Supreme Court intended the

lower courts to be flexible in determining what prima facie elements should be utilized." Cifra v.

Gen. Elec. Co., 62 F. Supp. 2d 740, 743 n.2 (N.D.N.Y. 1999), aff'd in part and vacated in part on

different grounds, 252 F.3d 205 (2d Cir. 2001). Again, as explained above, "to survive a motion

to dismiss, a plaintiff need not allege specific facts establishing every aspect of a prima facie case

of discrimination. A complaint is sufficient if it states a facially plausible claim and gives fair

notice to defendants of the basis for the claim." Barbosa v. Continuum Health Partners, Inc., 716

F. Supp. 2d at 218 (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d at 678-79).

### b) Defendant NCA's Arguments

#### i) Supplemental Materials

Before the Court addresses the defendant NCA's individual arguments in furtherance of its motion to dismiss, the Court notes that plaintiffs object to the Court considering any extra pleading materials submitted by NCA in support of its motion to dismiss, arguing that this motion must be decided only on the pleadings and attachments thereto. (Pls.' Mem. at 28-29). As the court in Carter v. Potter noted, "[w]hen matters outside the pleadings are presented in connection with a motion to dismiss, 'a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." (Id. at 29 (quoting No. 06 CR 3854, 2007 WL 879417, at *3 (E.D.N.Y. Mar. 22, 2007) (quoting Friedl v. City of New York, 210 F.3d 79, 83 (2d Cir. 2000)))). Here, the Court agrees with plaintiffs' contention that they "should not have to defend against a Rule 56 motion prior to the commencement of discovery" (Pls.' Mem. at 29), and, accordingly, the additional supplementary materials submitted by NCA have not been considered.

#### ii) Not Qualified

NCA first argues that plaintiffs' Complaints should be dismissed because they fail to adequately allege that plaintiffs were qualified for the pilot positions. (Defs.' Mem. at 21, 45). Defendants argue that in order to satisfy the requisite pleading standards, plaintiffs must allege that they possessed the Air Transport Pilot ("ATP") License that is required in order to pilot a

B747 aircraft. (Id.) However, only plaintiff Frith has included such an allegation in his Complaint (Frith Compl. ¶ 24), and defendants note that plaintiffs actually "admit that (except for Frith) they did not possess ATP licenses." (Defs.' Mem. at 45). Furthermore, NCA contends that, by plaintiffs' own admissions, "not one of the plaintiffs was qualified to be a First Officer because they lacked [] the requisite 3,000 flight hours to pilot B747 aircraft[s]." (Id. at 21, 45-46). NCA therefore argues that these factors contradict plaintiffs' claims that they were qualified for the position of pilot, or First Officer. (Id. at 45). In light of the objective nature of these two requirements for these positions, NCA argues that "there is no set of facts under which [plaintiffs] could prevail on their failure to hire/failure to promote claims against NCA. (Id. at 46).

NCA misapprehends the nature of plaintiffs' claims of national origin and age discrimination. Although plaintiff Frith alleges that he actually had his ATP license and had logged more than 2,000 flight hours (Pls.' Mem. at 32; Frith Compl. ¶ 24; see also Defs.' Mem. at 21), plaintiffs do not allege that they were qualified to immediately step into the shoes of First Officers. Rather, they allege disparate treatment based on the allegation that younger Japanese Flight Engineers were given opportunities for training and advancement that were not offered to plaintiffs because of their age and nationality. Regardless of plaintiffs' lack of qualifications, plaintiffs allege that defendants trained and hired some "younger Japanese pilots with lesser qualifications, including only 400 flight hours," thus suggesting that age or national origin was a factor in NCA's decision not to promote the plaintiffs or offer them the same opportunities for advancement offered to younger Japanese pilots. (See Bakeer Compl. ¶ 25; Weaver Compl. ¶

25; Michaud Compl. ¶ 21; Frith Compl. ¶ 24; see also Pls.' Mem. at 32).

Specifically, in response to NCA's argument that plaintiffs were not qualified to be upgraded to pilots, plaintiffs allege that many unqualified Japanese Flight Engineers were nevertheless upgraded and were offered "job placement benefits and other opportunities," which were not offered to plaintiffs. (Pls.' Mem. at 32). For example, plaintiffs allege in their Complaints that "Defendant NCA had offered Japanese Flight Engineer's [sic] paid training to become pilots, which is known as an 'upgrade.' However, such upgrades were never offered to the plaintiff[s] or other non-Japanese Flight Engineer's [sic]." (Bakeer Compl. ¶ 23; Weaver Compl. ¶ 23; Michaud Compl. ¶ 19; Frith Compl. ¶ 23). The Complaints further allege that, upon "retirement of the Classics, Defendants have offered job placement, retirement benefits and other opportunities to its Japanese Flight Engineers. By contrast, Defendants have not offered any form of job placement, retirement benefits, or other opportunities to plaintiff[s] or other non-Japanese Flight Engineers." (Bakeer Compl. ¶ 26; Weaver Compl. ¶ 26; Michaud Compl. ¶ 22; Frith Compl. ¶ 26). Each plaintiff alleges that although "[t]he retirement of the Classics affects all Flight Engineer's [sic] working for Defendants[,] . . . only plaintiff and other non-Japanese Flight Engineer's [sic] were discriminated against when they were terminated without any offer of upgrade, early retirement, or alternative employment with Defendants." (Bakeer Compl. ¶¶ 28, 32-35; Weaver Compl. ¶¶ 28, 32-35; Michaud Compl. ¶¶ 23, 27-29; Frith Compl. ¶¶ 28, 32-35).

Based on the allegations in plaintiffs' Complaints, that NCA trained and hired younger Japanese individuals who had not logged the requisite number of hours or did not have the ATP

57

license, but failed to hire the more qualified plaintiffs, the Court finds that plaintiffs have alleged sufficient facts to state a plausible claim of race and age discrimination, and to provide notice to defendant of the basis for their claims. NCA's arguments regarding the specifics as to plaintiffs' ATP licensing status and flying time raise issues of fact that are better addressed after discovery, in the context of a motion for summary judgment; these are not the types of facts that need to be alleged at this stage.

Accordingly, the Court respectfully recommends that NCA's motion to dismiss based on this ground be denied.

### iii) Not Similarly Situated

NCA also contends that the plaintiffs' claim of disparate treatment fails because they cannot show that they were treated less favorably than "similarly situated" employees. (Defs.' Mem. at 46-47). See Shumway v. United Parcel Service, Inc., 118 F.3d 60, 63 (2d Cir. 1997). In order to demonstrate a prima facie case of discrimination, plaintiff must establish that the alleged misconduct "took place under circumstances giving rise to an inference of discrimination." Graham v. Long Island R.R., 230 F.3d 34, 39 (2d Cir. 2000). A plaintiff may support such an inference by showing that an employer "treated him less favorably than a similarly situated employee outside his protected group." Id.; see also Norville v. Staten Island Univ. Hosp., 196 F.3d 89, 95 (2d Cir. 1999). In order to substantiate the existence of disparate treatment, the plaintiff must compare himself to employees who are "similarly situated in all material respects." Shumway v. United Parcel Service, Inc., 118 F.3d at 64. This entails showing that the

58

comparator "engaged in comparable conduct" to that of the plaintiff. Id. To clarify, the court in

Mitchell v. Toledo Hospital indicated that the plaintiff and his comparator must "have dealt with

the same supervisor, have been subject to the same standards and have engaged in the same

conduct without such differentiating or mitigating circumstances that would distinguish their

conduct or the employer's treatment of them for it." 964 F.2d 577, 583 (6th Cir. 1992) (citing

Mazzella v. RCA Global Comms., Inc., 642 F. Supp. 1531 (S.D.N.Y. 1986), aff'd, 814 F.2d 653

(2d Cir. 1987)).

The Shumway "all material respects" standard for similarly situated employees can be

satisfied if plaintiff shows that the colleagues to whom he seeks to compare himself "were

subject to the same performance evaluation and discipline standards," and yet "went

undisciplined" after engaging in "comparable conduct." Graham v. Long Island R.R., 230 F. 3d

at 40; see also Norville v. Staten Island Univ. Hosp., 196 F.3d at 96. Furthermore, "an

employee's conduct need not be identical to that of another for the two to be similarly situated."

Graham v. Long Island R.R., 230 F. 3d at 40. Specifically, the Supreme Court has used the

language "comparable seriousness" to describe the nature of conduct eligible for claims arising

under the "similarly situated" doctrine. McDonnell Douglas Corp. v. Green, 411 U.S. at 804.

The Supreme Court further emphasized that "precise equivalence in culpability between

employees is not the ultimate question." McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 273,

283 n.11 (1976). This interpretation, as elaborated upon in Ercegovich v. Goodyear Tire &

Rubber Company, cautions courts against assuming "that the specific factors discussed in

Mitchell are relevant factors in cases arising under different circumstances." 154 F.3d 344, 352

(6th Cir. 1998). Instead, the court in Ercegovich noted that a court "should make an independent determination" as to which facts in a particular case are relevant when comparing the plaintiff and his/her comparators. Id. The similarity of the two employees' situations must only "exist in all relevant aspects of their respective employment circumstances." Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) (emphasis added) (citations omitted).

The standard should therefore be whether there is an "objectively identifiable basis for comparability." Cherry v. American Tel. & Tel. Co., 47 F.3d 225, 229 (7th Cir. 1995). Courts have discretion when comparing employees and there need only be a "reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases." Graham v. Long Island R.R., 230 F.3d at 40; (citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 20 (1st Cir. 1999)). "[R]easonableness is the touchstone," and the situations "need not be perfect replicas" of each other to merit comparison. Id.

NCA contends that plaintiffs' reliance on the Japanese Flight Engineers as comparator employees is misplaced because plaintiffs were not similarly situated to the Japanese Flight Engineers "in all material respects." (Defs.' Mem. at 47). NCA claims that the Japanese Flight Engineers were employees of ANA, while plaintiffs were employees of HACS, PARC U.S., and PARCL, and that their terms and conditions of employment were set by their respective employers, not by NCA. (Id.; Defs.' Reply at 16). Moreover, the ANA Flight Engineers were assigned to On-Line Points in Asia, not in the United States, and their employment was governed by the terms of a collective bargaining agreement between their union and ANA. (Defs.' Mem. at 47-48; Defs.' Reply at 16-17). NCA argues that the mere fact that both sets of Flight

Engineers were assigned as members of NCA's B747-200 aircraft crews is not sufficient to establish that they were similarly situated. (Defs.' Mem. at 47).

However, a review of the plaintiffs' Complaints demonstrates that plaintiffs have adequately pleaded facts sufficient to withstand a motion to dismiss their claims of discrimination without pleading additional facts to establish that they were similarly situated to their Japanese counterparts. Throughout their Complaints, plaintiffs allege that they were treated differently from the Japanese Flight Engineers who also flew Classics. (Bakeer Compl. ¶¶ 22-25; Weaver Compl. ¶¶ 22-25; Michaud Compl. ¶¶ 19-21; Frith Compl. ¶¶ 22-24). In the first cause of action, plaintiffs allege that defendants offered the Japanese Flight Engineers various terms and conditions of employment that were "not offered to their similarly situated non-Japanese employees." (Bakeer Compl. ¶¶ 32-35; Weaver Compl. ¶¶ 32-35; Michaud Compl. ¶¶ 27-29; Frith Compl. ¶¶ 32-35). They further allege that these distinctions in treatment were "not justified on the basis of any bona fide occupational qualification ('BFOQ')." (Bakeer Compl. ¶¶ 32-35, 45-48; Weaver Compl. ¶¶ 32-35, 45-48; Michaud Compl. ¶¶ 27-29, 38-40; Frith Compl. ¶¶ 32-35, 45-48).

In responding to NCA's claim that they were not similarly situated to the Japanese flight engineers, plaintiffs argue that not only were they "often shar[ing] the same cockpit with their Japanese counterparts" and sitting in the same seats, but their responsibilities were the same and they had the same supervisors. (Pls.' Mem. at 32-34). Plaintiffs therefore assert that "the flight engineers could not have been more similarly situated." (Id. at 33). NCA asserts that plaintiffs did not allege many of these facts in their Complaints, "but even if they had, there is no assertion,

even in their brief, that the 'same supervisors' allegedly shared by plaintiffs and the ANA Flight

Engineers were the ones who made decisions about plaintiffs' compensation, their eligibility for

upgrades, and the termination of their contacts." (Defs.' Reply at 16). Regardless, NCA argues

that "it cannot be disputed [that] plaintiffs and the ANA Flight Engineers were, in fact, subject to

'such differing or mitigating circumstances that would distinguish their employer's treatment of

them.'" (Id. (citing Mitchell v. Toledo Hospital, 964 F.2d at 583)).

The question of whether someone is similarly situated is generally not resolved on a

motion to dismiss, see Jordan v. Potter, No. 05 CV 3005, 2007 WL 952070, at *4 n.3 (E.D.N.Y.

Mar. 29, 2007) (noting that "[t]he question of whether other employees were similarly situated to

a plaintiff is a question of fact that is not appropriately resolved on a motion to dismiss"); see

also Lee v. HealthFirst, Inc., No. 04 CV 8787, 2006 WL 177175, at * 7 (S.D.N.Y. Jan. 25, 2006),

because the analysis is highly fact specific. Indeed, apart from conceding that "all Flight

Engineers–whether employed by American Airlines, United Airlines, NCA, or any number of

crew-leasing companies–have similar duties and responsibilities" (Defs.' Reply at 16), NCA's

arguments raise questions that require fact specific comparisons among the various Flight

Engineers. Specifically, NCA contends that even though plaintiffs and their Japanese

counterparts may all be Flight Engineers, "does not mean that they have the same supervisor or

have been subject to the same standards and conduct." (Id.) To the extent that NCA is making

this assertion, the Court is without sufficient facts to evaluate the claim; indeed, the Court, on a

motion to dismiss, is constrained to consider only plaintiffs' allegations, which state that the

plaintiffs are "similarly situated" to the Japanese employees. At this time, prior to discovery, and

without the benefit of additional evidence, the Court is in no position to evaluate NCA's argument that there were significant differences between plaintiffs and the ANA Flight Engineers that would render them inappropriate comparators. Given that there is no requirement that plaintiffs establish each and every element of their prima facie case, the Court finds the plaintiffs' allegations on the issue of whether they were similarly situated to be sufficient for purposes of this motion to dismiss.

Although NCA concedes the general rule that the question of similarly situated may not be appropriate for resolution on a motion to dismiss, NCA contends that, where as here, the alleged similarly situated employees were employed by an entirely different and unrelated company from plaintiffs' employers, the general rule should not apply because the Complaints fail to set forth plausible claims for discrimination. (Defs.' Mem. at 48).

However, a review of the Complaints demonstrates that plaintiffs have adequately pleaded facts sufficient to withstand dismissal on the question of whether NCA was plaintiffs' "employer." Under the "'joint employer' doctrine – an employee formally employed by one entity can be found to be constructively employed by another entity." Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 218. Thus, where there is a showing of "immediate control" over the other company's employees, indirect employers may be held liable for employment discrimination. Id. Similarly, under New York law, applicable to plaintiffs' claims of discrimination under the NYSHRL and NYCHRL, "a determination that an employer-employee relationship exists may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results." Fowler v. Scores

63

Holding Co., 677 F. Supp. 2d at 680 (quoting Scott v. Mass. Mut. Life Ins. Co., 68 N.Y.2d 429, 433, 633 N.Y.S.2d 754, 756, 657 N.E.2d 769, 771 (1995)).

Looking solely to the allegations in the Complaints, plaintiffs have alleged that NCA was their joint employer and that regardless of who was nominally their employer, it was NCA that dictated the terms and conditions of employment, that made the decisions regarding the discontinuance of the Classics fleet, and decided which Flight Engineers would receive advancement opportunities. (Pls.' Mem. at 34). "NCA directed and set [their] pay, vacation time, sick days, scheduled the hours [they] worked, provided [them] with a uniform and badge denoting [their] employee-status, provided all training, provided all rules and regulations pertaining to [their] employment, held full authority for discipline and promotion, and directed all policies and procedures with regard to [their] employment." (Bakeer Compl. ¶ 18; Weaver Compl. ¶ 18; Michaud Compl. ¶ 15; Frith Compl. ¶ 18). Plaintiffs also allege that NCA actually owns ANA, and therefore, "given the ownership relationship between NCA and ANA, [plaintiffs] would expect to explore issues of joint employment and/or alter ego through discovery." (Pls.' Mem. at 34 n.6). These facts alleging that NCA was a joint employer are sufficient to survive a motion to dismiss.

Under these circumstances, particularly since this is an employment discrimination action, where the question of whether persons are similarly situated is not normally decided on a motion to dismiss because it is a fact intensive inquiry, see Gratton v. JetBlue Airways, No. 04 CV 7561, 2005 WL 1251786, at *7 (S.D.N.Y. May 25, 2005), the Court finds that NCA's arguments in this regard are more appropriately considered after discovery and respectfully

recommends that NCA's motion to dismiss on this ground be denied.

### iv) Union Contract

With respect to plaintiffs Weaver's, Frith's, and Bakeer's claims that NCA violated Title

VII, Section 1981, the ADEA, the NYSHRL, and the NYCHRL by denying them pay increases

in years where the Japanese Flight Engineers were paid cost of living increases (See Bakeer

Compl. ¶ 22; Weaver Compl. ¶ 22; Frith Compl. ¶ 22[48]), NCA contends that the ANA employees

were subject to a collective bargaining agreement and that those increases were negotiated as a

result of the agreement with the union. (Defs.' Mem. at 48). Plaintiffs, who were not members

of the union, were therefore not covered by the increase.[49] (Id.; Defs.' Reply at 17). NCA

contends that because it was required by Japanese law to pay these increases under the ANA

CBA, plaintiffs cannot complain that NCA violated the United States federal anti-discrimination

---

[48]These allegations state that:

> In employment year 2002-2003, and again in 2006, plaintiff was coerced by Defendants to forgo his cost of living increases due to NCA's financial difficulties. It was understood that if plaintiff did not forgo his cost of living increases, his employment would not be renewed. Plaintiff was informed that the cost of living increases would be paid in arrears at some later point in time. Defendant never paid the plaintiff for his cost of living increases for the contract year 2002-2003. However, Japanese Flight Engineer's [sic] were paid these cost of living increases in 2004. Moreover, plaintiff was informed that his 2006 cost of living increases would be paid in 2008, even if he was no longer working for defendants.

(Bakeer Compl. ¶ 22; Weaver Compl. ¶ 22; Frith Compl. ¶ 22). Plaintiff Michaud's Complaint does not include these factual allegations.

[49]NCA notes that although plaintiffs allege that Michaud joined a Japanese labor union at some point (Pls.' Mem. at 35), "that fact is irrelevant to this motion because he joined a different union than the one that represented the ANA Flight Engineers. Moreover, Michaud's union never achieved a collective-bargaining agreement with NCA." (Defs.' Reply at 17; see supra at 9 n.12).

laws in doing so. (Defs.' Mem. at 49; Defs.' Reply at 17). NCA claims that "[i]t is not unlawful for an employer to take an action that would otherwise violate Title VII if refusal to take such an action, with respect to a worker in a foreign country, would violate that foreign country's laws." (Defs.' Mem. at 49 (emphasis added) (citing Ofori-Tenkorang v. Am. Int'l Group, Inc., 460 F.3d 296, 303 n.6 (2d Cir. 2006); Torrico v. Int'l Bus. Machines Corp., 213 F. Supp. 2d 390, 399 (S.D.N.Y. 2002)); see also Defs.' Reply at 17-18).

In response to NCA's argument, plaintiffs assert that union membership is irrelevant to their claims of discrimination. (Pls.' Mem. at 35). Plaintiffs contend that NCA has failed to cite to any Japanese authority to support their argument that a refusal to pay these increases to its Japanese employees would violate Japanese law, as NCA alleges. (Id.) Even assuming that such a refusal would be unlawful, NCA has not explained how its refusal to pay similar cost of living increases to its non-Japanese, non-union member Flight Engineers was not discriminatory. (Id.)

While NCA is correct that Congress limited the extraterritorial impact of the ADEA and Title VII by providing that "actions of employers that would otherwise be unlawful are not unlawful if compliance with the relevant statute would cause the employer to violate the laws of the country in which the employee works," Ofori-Tenkorang v. Am. Int'l Group, Inc., 460 F.3d at 303 n.6, NCA has failed to articulate how this limitation applies in this case. Even if it would be a violation of Japanese law for NCA not to pay wages to its Japanese employees in accordance with the ANA CBA, NCA has not asserted that it would be unlawful for the company to pay the same wage rates to its non-Japanese employees. The fact that the ANA CBA provides for a certain level of wages does not absolve NCA of its obligation not to discriminate.

Accordingly, at this stage of the action, without further information, the Court respectfully recommends that defendant's motion to dismiss on this ground be denied.

### v) Extraterritorial Application of Title VII and the ADEA

NCA also argues that the plaintiffs have failed to allege that NCA made any discriminatory decisions or engaged in any discriminatory conduct in the United States and thus plaintiffs' Title VII and ADEA claims must be dismissed because there is no extraterritorial application of these statutes under the circumstances. (Defs.' Mem. at 53). NCA argues that is not an American company, nor is it controlled by an American company; it is incorporated under the laws of Japan, maintains its headquarters in Japan, and all of its officers and shareholders are Japanese citizens and residents or Japanese entities. (Id.; Defs.' Reply at 18). "Consequently, [NCA argues that] neither Title VII nor the ADEA can be applied extraterritorially to govern decisions made by NCA– a Japanese company – in Japan." (Defs.' Mem. at 54).

Congress has explicitly extended the application of certain civil rights statutes to cover conduct that occurs overseas. See 42 U.S.C. § 2000e(f) (amending the definition of "employee" under Title VII to provide that "with respect to employment in a foreign country, [the] term includes an individual who is a citizen of the United States"); 29 U.S.C. § 621 (amending the definition of "employee" under the ADEA to include any citizen of the United States employed by an employer in a foreign country); see also EEOC v. Arabian American Oil Co. (Aramaco), 499 U.S. 244, 259 (1991) (discussing amendment making "'provisions of the [ADEA] apply to citizens of the United States employed in foreign countries by U.S. corporations or their

67

subsidiaries'"). Thus, in determining whether there should be an extraterritorial application of Title VII or the ADEA, courts evaluate whether the employee is a U.S. citizen and whether the employer is controlled by an American employer. See, e.g., Denty v. SmithKline Beecham Corp., 109 F.3d 147, 150 (3d Cir.), cert. denied, 522 U.S. 820 (1997) (holding that the "ADEA applies abroad only when (1) the employee is an American citizen and (2) the employer is controlled by an American employer"); Shekoyan v. Sibley International Corp., 217 F. Supp. 2d 59, 65 (D.D.C. 2002) (holding that "Congress has provided that Title VII will only have an extraterritorial application when: (1) the employee is a U.S. citizen and (2) the employee's company is controlled by an American employer"), aff'd, 409 F.3d 414 (D.C. Cir. 2005), cert. denied, 546 U.S. 1173 (2006).

Plaintiffs raise several arguments in response to defendant's motion to dismiss on this ground. First, plaintiffs point out that three of the plaintiffs are not only U.S. citizens, but all four plaintiffs were employed in the United States, not in a foreign country. (Pls.' Mem. at 35-36). Thus, even though plaintiff Frith is an Australian citizen, plaintiffs contend that he is still covered by Title VII and the ADEA because the "center of gravity"[50] of all of the plaintiffs' employment relationships was in the United States. In making this argument, plaintiffs rely on

---

[50]But, cf., Ofori-Tenkorang v. Am. Int'l Group, Inc., 460 F.3d at 298, 304-05 (declining to apply the center of gravity test to a claim under Section 1981, holding that plaintiff, a non-U.S. citizen who was discriminated against while working in South Africa could not bring a Section 1981 claim for the discrimination that occurred outside the United States, but could pursue his claims of discrimination that occurred in the United States prior to his transfer overseas. The court noted that there was a distinction between claims brought under Section 1981 which "unambiguously requires that a person be 'within the jurisdiction of the United States,'" id. (quoting 42 U.S.C. 1981(a)), and claims under Title VII and the ADEA where Congress had specifically amended the statute to allow U.S. citizens employed outside the United States to bring a claim under Title VII and the ADEA).

68

the analysis employed by the court in <u>Torrico v. Int'l Business Machines Corp.</u>, 213 F. Supp. 2d at 393-94, 403. There, the court held that the plaintiff, a non-U.S. citizen employed in New York, but assigned to a temporary position in Chile, could pursue Title VII claims because the "center of gravity" of his employment relationship was the United States. <u>Id.</u>

Plaintiffs argue that the "center of gravity" of their employment relationship with NCA was New York, where they flew in and out of and received their assignments. (Pls.' Mem. at 36). Furthermore, defendants have admitted that plaintiffs Bakeer, Weaver, and Frith were each notified of their termination by letters were sent to their respective homes in Virginia, Alaska, and Texas. (Collins Decl. ¶¶ 32-34). Plaintiff Michaud was notified regarding his termination by e-mail, which he could have received in his home state of California or while working elsewhere in the United States. (Bell Decl. ¶ 21). Therefore, it can logically be argued that the alleged discriminatory termination occurred in the United States. Based on the allegations that JFK was designated as plaintiffs' On-Line Point and arguably the "center of gravity" of their employment relationship, plaintiffs have sufficiently alleged employment in the United States to survive a motion to dismiss.

Having considered the parties' arguments, the Court again finds that defendant NCA's motion to dismiss is premature. Discovery and a fuller explanation of NCA's arguments relating to the circumstances surrounding plaintiffs' employment and the decisions that were made regarding plaintiffs' termination are necessary before the Court can analyze whether plaintiffs' claims are not properly before this Court. Accordingly, it is respectfully recommended that defendant NCA's motion to dismiss the plaintiffs' Title VII and ADEA claims be denied.

69

2) Plaintiffs' Section 1981 and Breach of Contract Claims

NCA moves to dismiss plaintiffs' claims under Section 1981 and their common law

breach of contract claims, arguing that plaintiffs have no contractual relationship with defendant

NCA. (Defs.' Mem. at 49-50). In this case, the Complaints allege that each of the plaintiffs

entered into employment agreements with entities other than NCA: Frith's contract was with

PARCL; Bakeer and Weaver had contracts with PARC U.S.; and Michaud's contract was with

HACS.

Section 1981 provides an alternative remedy for employment discrimination apart from

Title VII. See Ofori-Tenkorang v. Am. Int'l Group, Inc., 460 F.3d at 300 (citing Johnson v. Ry.

Express Agency, 421 U.S. 454, 459-60 (1975)). The Statute was enacted to ensure: "[a]ll

persons within the jurisdiction of the United States shall have the same right in every State and

Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. §

1981(a). This "includes the making, performance, modification, and termination of contracts,

and the enjoyment of all benefits, privileges, terms, and conditions of the contractual

relationship." 42 U.S.C. § 1981(b). In the absence of a contractual relationship with the

defendant, plaintiffs may not maintain a claim under Section 1981. See Burrell v. AT&T Corp.,

No. 03 CV 2490, 2005 WL 2656124, at *3 (S.D.N.Y. Oct. 18, 2005).

With respect to NCA's motion to dismiss plaintiffs' claims under Section 1981 based on

the absence of any contractual agreement between plaintiffs and NCA, plaintiffs allege that NCA

was a joint employer, with immediate control over the Flight Engineers. (Pls'. Mem. at 37). In

the alternative, plaintiffs argue that when they entered into their respective contracts with HACS,

70

PARC Aviation, and PARCL, it was for the purpose of assignment to NCA and thus each contract "confer[red] a benefit on NCA. Therefore, NCA should be considered a party to the contract." (Id.) The employment contracts required plaintiffs to perform in accordance with NCA's rules and requirements and it was NCA that informed plaintiff of the termination of their contracts. (Id. at 37-38). Plaintiffs also note that "NCA was protected in the contract in the event that it was unable to perform within specific situations," and that "Plaintiffs agreed to protect NCA by agreeing to hold in confidence any information furnished to them by NCA." (Id. at 37).

Defendant NCA responds that Weaver, Frith, and Bakeer cannot meet the first prong of a breach of contract claim – namely, that plaintiffs cannot prove the existence of a contract. (Defs.' Mem. at 58-59). "Each and every employment agreement they entered into was between them and one of PARC Aviation's subsidiaries . . . Neither Weaver, Frith, nor Bakeer ever entered into a contract with NCA. For that reason alone, their breach of contract claims . . . against NCA must be dismissed." (Id. at 59). Defendant argues:

> Even if NCA were found to be a third-party beneficiary of plaintiffs' employment agreements, that relationship would not be a basis for liability under § 1981. Although some authority supports the proposition that an intended third-party beneficiary of a contract may have the right to bring a § 1981 claim against a party to the contract, plaintiffs have not cited, and NCA has not identified, any authority for the proposition that a contracting plaintiff has a § 1981 cause of action against a third-party beneficiary to that contract.

(Defs.' Reply at 18-19). However, the Court notes that NCA has failed to supply any case law to support this argument or to demonstrate that plaintiffs cannot bring this claim.

NCA further asserts that "[t]he unambiguous terms of the contracts" and amendments

"dictate that their contracts were set to expire when NCA ceased to operate the B747-200

'Classics,' which is what, in fact, occurred. The contracts were not terminated prior to their

expiration dates. Plaintiffs do not allege that they had any contractual right to further renewals or

extensions of their contracts." (Defs.' Mem. at 60). Therefore, NCA concludes that "plaintiffs

cannot maintain a cause of action for breach of their expired contracts by any defendant, let alone

NCA, who was not a party to the agreements." (Id.)

Plaintiffs respond that they "have pled facts to show a contract existed between

themselves and NCA. . . . NCA should be considered a party to the contract, because: 1) it acted

as a joint employer; 2) because the contracts conferred a mutual benefit on NCA; and, 3) it acted

as a party to the contract when it advised plaintiffs in writing of the termination of their

employment agreement." (Pls.' Mem. at 43). Plaintiffs further assert that even though their

original employment agreements were subsequently altered by amendment, the notice provisions

in Weaver's, Bakeer's, and Frith's agreements, providing for a period of notice in the event of a

change of economic conditions, remained in effect despite the amendments. (Id. at 43-44).

Plaintiffs contend that since all three plaintiffs received notice of their terminations 90 days in

advance and that each of the three agreements actually entitled them to between six and eighteen

months notice, NCA was in breach of plaintiffs' employment contracts. (Id.) Moreover, to the

extent that there is any ambiguity in the agreements, plaintiffs note that the agreements were

drafted by defendants and therefore ambiguities must be construed against them. (Id. at 44).

As discussed supra at 63-64, courts in this circuit have held that "an employee formally

employed by one entity can be found to be constructively employed by another entity and may

72

therefore state an employment discrimination claim against her constructive employer as well as her direct employer." Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 216-17. Therefore, "'[a] joint employer relationship may be found to exist where there is sufficient evidence that the respondent had immediate control over the other company's employees,'" id. at 217, or "where two employers 'handle certain aspects of their employer-employee relationship jointly.'" Fowler v. Scores Holding Co., Inc., 677 F. Supp. 2d at 681 (quoting Arculeo v. On-Site Sales & Mktg., LLC, 425 F.3d 193, 198 (2d Cir. 2005)). Plaintiffs simply "must plead enough facts so that the claim is facially plausible and gives fair notice to defendants of [their] theory of employer liability." Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 219. Even if plaintiffs do not plead "extensive facts" with respect to NCA's control over plaintiffs as employees, "defendants are far more likely to be in possession of those facts than [plaintiffs]." Id. As long as plaintiffs' "allegations are sufficient to put [NCA] on notice of the theory of employer liability upon which [their] claims are based," plaintiffs "ha[ve] satisfied [their] pleading burden as to this issue." Fowler v. Scores Holding Co., Inc., 677 F. Supp. 2d at 681.

Plaintiffs have alleged that "NCA directed and set [their] pay, vacation time, sick days, scheduled the hours [they] worked, provided [them] with a uniform and badge denoting [their] employee-status, provided all training, provided all rules and regulations pertaining to [their] employment, held full authority for discipline and promotion, and directed all policies and procedures with regard to [their] employment." (Bakeer Compl. ¶ 18; Weaver Compl. ¶ 18; Michaud Compl. ¶ 15; Frith Compl. ¶ 18). This is a sufficiently detailed allegation to survive the

73

motion to dismiss stage. Furthermore, as the court noted in <u>Fowler</u>, where plaintiffs' allegations are sufficient to put the defendant on notice of the theory of employer liability, "the determination of whether [NCA] was [plaintiffs'] employer is a question of fact that cannot be decided on a motion to dismiss." <u>Fowler v. Scores Holding Co., Inc.</u>, 677 F. Supp. 2d at 680-81 (citations omitted). (<u>See also</u> Tr. at 41 (where counsel for plaintiffs asserted that <u>Fowler</u> stands for the proposition that "if there is liability alleged, plausibly, against the HACS and PARC entities, the joint employment status must, for purposes of this motion, be accepted as true")). Given that there has been no discovery as to the relationship of the various defendants to one another, the Court agrees that it would be premature to make a determination on joint employment status at this time.

In addition, NCA also specifically seeks to dismiss Ms. Michaud's claim, brought on behalf of her deceased husband, arguing that even if her husband could be found to have had a contract with NCA, she personally did not have one. (Defs.' Mem. at 49-50). The Court finds this argument to be unpersuasive given that plaintiff Michaud stands in the shoes of her husband, in a "representative capacity" for purposes of this suit; her claims depend upon her husband's capacity to bring suit and are not brought "in an individual capacity." (Pls.' Mem. at 38).

Therefore, having reviewed the allegations in the Complaints, the Court finds that each of the plaintiffs has sufficiently stated a claim for breach of contract and it is respectfully recommended that NCA's motion to dismiss these claims be denied. It is also respectfully recommended that NCA's motion to dismiss plaintiffs' Section 1981 claims be denied as premature.

74

3) Plaintiffs' NYSHRL and NYCHRL Claims

NCA also seeks to dismiss plaintiffs' NYSHRL and NYCHRL claims because none of
the plaintiffs resided in either New York State or New York City, nor did any of the
discriminatory conduct occur in New York. (Defs.' Mem. at 50-53; Defs.' Reply at 19).

Under the NYSHRL, a plaintiff seeking to avail himself of the protections of the law
must allege that a discriminatory decision was made in New York State or, in the case of the
NYCHRL, in New York City. Hoffman v. Parade Publ'ns, 65 A.D.3d 48, 50-55, 878 N.Y.S.2d
320, 322-26 (1st Dep't 2009); see Rice v. Scudder Kemper Invs., Inc., No. 01 CV 7078, 2003
WL 21961010, at *5 (S.D.N.Y. Aug. 14, 2003) (holding that in order to state a claim under
NYSHRL, a non-resident plaintiff must show that he was discriminated against in New York);
Iwankow v. Mobil Corp., 150 A.D.2d at 273, 541 N.Y.S.2d at 429 (holding that absent an
allegation that a discriminatory act was committed in New York or that a New York State
resident was subjected to discrimination, a claim under the NYSHRL will not lie). "The
framework for analyzing NYSHRL and NYCHRL discrimination claims is essentially the same
as under Title VII and the ADEA." Butler v. New York Health & Racquet Club, No. 08 CV 591,
2011 WL 310333, at *9 (S.D.N.Y. Jan. 26, 2011); see also Barbosa v. Continuum Health
Partners, Inc., 716 F. Supp. 2d at 217 (noting that "Section 1981, the NYSHRL, and the
NYCHRL are generally analyzed under the same evidentiary framework that applies to Title VII
and ADEA claims"). However, while "New York courts require the same showing for claims
brought under the NYSHRL as federal employment discrimination claims brought under Title
VII . . . employment discrimination claims under the NYCHRL are to be reviewed independently

from, and more liberally than, their federal and state counterparts." Fowler v. Scores Holding Co., Inc., 677 F. Supp. 2d at 681-82. "[T]o survive a motion to dismiss, an employment discrimination claim need only satisfy the basic requirements of Rule 8 of the Federal Rules of Civil Procedure for a 'short and plaint statement of the claim.'" Id. at 682 (quoting Fed. R. Civ. P. 8(a)). Plaintiffs' allegations must "make it plausible that [plaintiffs] experienced a materially adverse change in the conditions of [their] employment because of" their race, age, or national origin. Id.

In this case, NCA contends that it is clear from the Complaints that none of the plaintiffs are New York residents; thus, in order to state a claim under the NYSHRL or the NYCHRL, plaintiffs must allege "specific facts" showing that acts of discrimination occurred in the State or the City. (Defs.' Mem. at 51; Defs.' Reply at 19). NCA asserts that "[t]here is not one allegation as to someone saying something, doing something, a decision being made in New York." (Tr. at 32). According to NCA, although plaintiffs have alleged that they were assigned to the JFK On-Line Point, all that they did there was "land and take off" (Defs.' Mem. at 50), and they "spent the vast majority of their working time outside New York." (Defs.' Reply at 19).

NCA further contends that plaintiffs have alleged no basis for their belief that the decision to terminate their contracts occurred in New York; the decisions were all made at NCA's headquarters in Japan. (Id.; Defs.' Mem. at 51-52). NCA further points out that while the plaintiffs claim that they complained about the alleged discriminatory treatment, the Complaints fail to allege that the plaintiffs lodged their complaints or engaged in any other protected activity in New York nor that there is any evidence "tending to show that

discriminatory decisions were made in New York or had an impact in New York." (Defs.' Reply at 19; Defs.' Mem. at 52). Rather, NCA argues that plaintiffs' assertions are "based on pure speculation and [are] contradicted by the fact that NCA executives in Japan made the strategic decision to phase out the [C]lassics." (Defs.' Reply at 19). NCA therefore contends that there no basis for considering plaintiffs' claims under the NYSHRL or the NYCHRL.

Plaintiffs, however, contend that there is no requirement to show that they reside in New York in order for them to pursue a claim under the NYSHRL or NYCHRL. (Pls.' Mem. at 39; Tr. at 25). Instead, they argue that because the discriminatory decisions were made in part in New York and had an impact on New York, where plaintiffs worked at JFK, the claims are covered by these statutes. (Id. (citing Hoffman v. Parade Publ'ns, 65 A.D.3d at 52, 878 N.Y.S.2d at 324)); see also Shah v. Wilco Sys., Inc., 27 A.D.3d 169, 176, 806 N.Y.S.2d 553, 558 (1st Dep't 2005) (holding that the NYSHRL applies where "the impact is felt"). Plaintiffs also again emphasize that their "contacts [with New York] were much more significant" than simply taking off and landing planes and loading cargo. (Pls.' Mem. at 40).

During the oral argument on these motions, plaintiffs brought to the Court's attention a recent New York State Court of Appeals decision in which the Court of Appeals extended the protections of the NYCHRL and the NYSHRL to non-residents who work in the City, as long as they "plead and prove that the alleged discriminatory conduct had an impact within those respective boundaries." (Tr. at 25 (quoting Hoffman v. Parade Publ'ns, 15 N.Y.3d at 289, 933 N.E.2d at 746, 907 N.Y.S.2d at 147))). With respect to the NYCHRL, the court noted that "the application of the impact requirement does not exclude all nonresidents from its protection;

rather, it expands those protections to nonresidents who work in the city, while concomitantly

narrowing the class of nonresident plaintiffs who may invoke its protection." Hoffman v. Parade

Publ'ns, 15 N.Y.3d at 290, 933 N.E.2d at 747, 907 N.Y.S.2d at 148. The court further explained

that "[t]he Appellate Division's rule that a plaintiff need only plead and prove that the

employer's decision to terminate was made in the city is impractical [and] would lead to

inconsistent and arbitrary results. . . . the success or failure of an NYCHRL claim should not be

solely dependent on something as arbitrary as where the termination decision was made." Id. at

290-91, 933 N.E.2d at 747, 907 N.Y.S.2d at 148. With respect to the NYSHRL, the court came

to the same conclusion, stating that:

> The obvious intent of the State Human Rights Law is to protect
> "inhabitants" and persons "within" the state, meaning that those
> who work in New York fall within the class of persons who may
> bring discrimination claims in New York. Application of the
> "impact" requirement to the State Human Rights Law claims
> achieves the same ends as is the case with its City counterpart,
> because it permits those who work in the state to invoke its
> protections. Therefore, we conclude that a nonresident must plead
> and prove that the alleged discriminatory conduct had an impact in
> New York.

Id. at 291, 933 N.E.2d at 747, 907 N.Y.S.2d at 148.

"[G]iven the permissive pleading requirements for employment discrimination claims,"

the Court finds that "[plaintiffs have] satisfied [their] burden at this stage." Fowler v. Scores

Holding Co., Inc., 677 F. Supp. 2d at 683.

NCA has also argued that even if the other three plaintiffs' claims survive, Mr. Frith's

claim fails because he is not an American citizen, but rather is a citizen of Australia. (Defs.'

Mem. at 54). The Court disagrees. There is no mention in the NYSHRL or the NYCHRL of a

citizenship requirement. Furthermore, the NYCHRL explicitly prohibits employment

discrimination on the basis of citizenship status. See NYCHRL § 8-107. Such a prohibition

would be nonsensical if non-United States citizens could not invoke the protections afforded by

the NYCHRL. Accordingly, the Court respectfully recommends that the motion to dismiss

Frith's claims under the NYSHRL and the NYCHRL be denied.

### 4) United States-Japan Friendship, Commerce and Navigation Treaty

NCA raises yet another argument in support of its motion to dismiss plaintiffs' claims.

NCA contends that under the United States-Japan Friendship, Commerce and Navigation Treaty

("FCN Treaty"), the plaintiffs' claims are preempted and plaintiffs are barred from bringing this

suit. (Defs.' Mem. at 55-56 (citing FCN Treaty, Apr. 2, 1953, U.S.-Japan, art. VIII(1), 4 U.S.T.

2063, 2070)). NCA alleges that the FCN Treaty permits Japanese companies to favor their

fellow citizens on the basis of citizenship, and that the Treaty was entered into to "ensure the

foreign company's ability to control its overseas investments without interference from local-

hiring quotas." (Defs.' Mem. at 55 (quoting Ventress v. Japan Airlines, 486 F.3d 1111, 1116

(9th Cir. 2007))). As the Sixth Circuit noted in Wickes v. Olympic Airways, "both parties [to the

contract] deemed the right to utilize the services of their own nationals in managerial, technical,

and confidential capacities to be critical." 745 F.2d 363, 367 n.1 (6th Cir. 1984). NCA contends

that while the FCN Treaty does not permit Japanese companies operating in the United States to

engage in discrimination with blanket immunity from the provisions of Title VII, when it comes

to "executive personnel" or "other technical expert capacities," the Treaty contemplates that

discrimination based on citizenship or alienation would be permitted. (Defs.' Mem. at 56). NCA

79

also argues that any citizenship or alienage discrimination claims under State or City anti-discrimination laws would conflict with the FCN Treaty and would likewise be preempted. (Id. (citing Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d 305, 330 (S.D.N.Y. 2009))). However, the Court notes that none of the plaintiffs have asserted claims of discrimination on the basis of alienage or citizenship.

Plaintiffs contend that "the FCN Treaty does not grant Japanese corporations operating in the United States blanket immunity against the anti-discrimination provisions of [T]itle VII" and is inapplicable to this case. (Pls.' Mem. at 41 (quoting Schanfield v. Sojitz Corp. of Am., 663 F. Supp. 2d at 330)); see also Avigliano v. Sumitomo Shoji Am., Inc., 638 F.2d 552 (2d Cir. 1981), rev'd and remanded on other grounds, 457 U.S. 176 (1982). Plaintiffs argue that the FCN Treaty protects the foreign corporation only insofar as executives or highly technical foreign nationals are concerned, and that NCA has failed to cite any authority for the proposition that flight engineers are considered executives or highly technical employees, such that the FCN Treaty would bar their claims. (Pls.' Mem. at 42-43 (citing Ventress v. Japan Airlines, 486 F.3d 1111)).

The Ninth Circuit considered this issue in Ventress v. Japan Airlines, a case relied upon by the defendants, holding that the FCN Treaty did not bar a pilot's and flight engineer's state law claims, noting "that article VIII(1) [] confers on Japanese employers only the limited right to discriminate in favor of their fellow citizens for certain managerial and technical positions." 486 F.3d at 1118 (emphasis added). In explaining its reasoning, the court noted:

> As the circuits that have addressed the question have uniformly found, the main purpose of article VIII(1) is to guarantee the ability of each signatory's companies the ability to staff critical managerial and technical positions overseas with their fellow citizens. California's whistle-blower protection laws [at issue in the

> case] merely prevent [defendant] from retaliating against
> employees for reporting and resisting the employer's domestic law
> violations; the laws in no way conflict with [defendant's] limited
> treaty right to discriminate in favor of Japanese citizens. In the
> absence of conflict, there can be no preemption.

Id. at 1117 (emphasis added). The court also made it clear that "[f]or [the] purposes of Title VII,

citizenship and national origin are distinct concepts. Title VII prohibits only national origin

discrimination, not discrimination on the basis of citizenship." Id. at 1116 n.5 (citing Espinoza v.

Farah Mfg. Co., 414 U.S. 86 (1973)). Since the plaintiffs' claims in this case allege

discrimination on the basis of national origin and race, not citizenship, the Court finds that the

reasoning of the Ninth Circuit is applicable to this case. Furthermore, at this stage of the

litigation, it would be premature to decide the factual question of whether the flight engineers

qualify as critical managerial or technical experts, such that they would fall within the purview of

the Treaty. The Court therefore declines to find that plaintiffs' claims are preempted by the FCN

Treaty and respectfully recommends that NCA's motion to dismiss on this ground be denied.

## 5) Retaliation Claims

NCA also argues that plaintiffs' Complaints contain no factual allegations supporting

their claims of retaliation under Title VII, the ADEA, Section 1981, the NYSHRL, and the

NYCHRL. (Defs.' Mem. at 56-58 (emphasis in original). NCA asserts that "[n]one of the

plaintiffs allege what specific protected activity they participated in, nor do they assert that the

protected activity was known to NCA. Rather, plaintiffs' complaints merely contain generalized

allegations that mirror the legal requirements for establishing retaliation claims." (Id. at 57).

Therefore, NCA asserts that the plaintiffs' retaliation claims should be dismissed because

"Plaintiffs' Complaints simply do not plead any <u>facts</u> at all, let alone facts sufficient to make out a claim for retaliation, even under the liberal standard applied in employment discrimination cases and drawing all inferences in their favor." (<u>Id.</u> (emphasis added)).

Retaliation claims under Title VII are also governed by the three-step burden shifting analysis set forth in <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. at 802-03, which governs the allocation of burdens and the order of presentation as to proof. <u>See id.</u>; <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768-69 (2d Cir. 1998). To establish a claim of retaliation, plaintiff must first demonstrate a <u>prima facie</u> case of retaliation by showing: 1) that he participated in a protected activity known to the defendant; 2) that an adverse employment action was taken, disadvantaging plaintiff; and 3) that there is a causal connection between the protected activity and the adverse employment action. <u>Amar v. Hillcrest Jewish Ctr.</u>, 2009 WL 891795, at *6 (citing <u>Feingold v. New York</u>, 366 F.3d 138, 156 (2d Cir. 2004)); <u>see also Quinn v. Green Tree Credit Corp.</u>, 159 F.3d at 768-69; <u>Reed v. A.W. Lawrence & Co., Inc.</u>, 95 F.3d 1170, 1178 (2d Cir. 1996); <u>Ortiz v. Trustees of Columbia Univ.</u>, No. 96 CV 3018, 1999 WL 126448, at *6 (S.D.N.Y. Mar. 9, 1999).

Once the plaintiff establishes a <u>prima facie</u> case, the burden shifts to the defendant to point to evidence that there was a legitimate, non-discriminatory reason for the adverse employment action. If the defendant meets this burden, plaintiff must then demonstrate that the proffered legitimate reason was merely a pretext for impermissible retaliation. <u>See, e.g., Quinn v. Green Tree Credit Corp.</u>, 159 F.3d at 768-69; <u>Tomka v. Seiler Corp.</u>, 66 F.3d 1295, 1308 (2d Cir. 1995). The purpose of Section 2000e-3(a) is "obviously to forbid an employer from

retaliating against an employee because of the latter's opposition to an unlawful employment practice." Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d 590, 593 (2d Cir. 1988).

In establishing the first element, plaintiff does not need to show that the conduct which he objected to was in fact discriminatory conduct in violation of Title VII; he must, however, have "'a good faith, reasonable belief that the underlying employment practice was unlawful' under [Title VII]." Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998) (quoting Reed v. A.W. Lawrence & Co., 95 F.3d at 1178); see also Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d at 593. To the extent that an employee complains about perceived "unfair" treatment relating to job responsibility, hiring practices, or corporate policy, but fails to link the treatment to unlawful discrimination or to his protected status, he fails to establish that he was engaged in protected activity. Velasquez v. Goldwater Memorial Hosp., 88 F. Supp. 2d 257, 264 (S.D.N.Y. 2000) (holding that general complaints about corporate policy without linking it to plaintiff's status are insufficient to establish "protected activity" under Title VII); see also Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp., 126 F.3d 276 (holding that general complaints about job responsibility did not constitute protected activity where there was no evidence of discrimination); Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons, 842 F.2d at 593 (holding that general complaints about hiring practices were not "protected activity"). "[I]n order to be protected activity[,] the complainant must put the employer on notice that the complainant believes that discrimination is occurring." Ramos v. City of New York, No. 96 CV 3787, 1997 WL 410493, at *3 (S.D.N.Y. July 22, 1997).

83

Plaintiffs argue that their Complaints sufficiently allege that they engaged in protected activity by complaining about discriminatory treatment and that they were terminated following and because of their complaints. (Pls.' Mem. at 30-31 (citing Bakeer Compl. ¶¶ 38-41, 51-54, 63-65, 75-78, 88-91; Weaver Compl. ¶¶ 38-41, 51-54, 62-65, 75-80, 89-93, 102-106; Michaud Compl. ¶¶ 32-34, 43-45, 52-54, 63-65, 74-76; Frith Compl. ¶¶ 38-41, 50-54, 65-68, 76-79, 89-92, 102-105)). Specifically with respect to defendant NCA, the excerpts cited by plaintiffs from the various Complaints only contain legal conclusions, which are virtually identical to each other, and which state: "NCA terminated plaintiff, a covered employee, for his engagement in a protected actively, namely opposing, and complaining about, discriminatory treatment. Plaintiff's termination was retaliatory in nature as it followed plaintiff's repeated complaints to NCA that he was being treated in a discriminatory fashion as compared to Japanese employees," and that plaintiffs' terminations "followed plantiff[s'] repeated complaints to defendant NCA that he was being treated in a discriminatory fashion." (Bakeer Compl. ¶¶ 38, 51, 62, 75, 88; Weaver Compl. ¶¶ 38, 51, 62, 90, 103; Michaud Compl. ¶¶ 32, 43, 52, 63, 74; Frith Compl. ¶¶ 38, 51, 65, 76, 89, 102).

Plaintiffs contend that these allegations, which must be accepted as true for purposes of this motion, satisfy the pleading standards as set forth in the court's opinion in <u>Amar v. Hillerst Jewish Center</u>. (Pls.' Mem. at 30-31 (citing 2009 WL 891795, at *5-6 (holding that "[t]o state a claim for retaliation in violation of Title VII, a plaintiff must plead facts that would tend to show that: (1) he participated in a protected activity known to the defendant; (2) the defendant took an employment action disadvantaging [plaintiff]; and (3) there exists a causal connection between

the protected activity and the adverse action"))). Plaintiffs assert that they have alleged that they "(1) engaged in a protected activity, namely opposing and complaining about discriminatory treatment; (2) defendants terminated plaintiffs for opposing and complaining about, discriminatory treatment; (3) the termination followed plaintiffs' repeated complaints to defendants." (Id.)

However, as defendants note, these allegations do not contain <u>any</u> facts, specifics, or examples of actual complaints that were made or other protected activity that plaintiffs engaged in.[51] In the absence of, at minimum, factual allegations as to when complaints were made, what the subject of the alleged complaints were, and an indication as to whom the complaints were conveyed, it is hard to see how defendants can be said to have received fair notice sufficient to prepare a defense. Therefore, having reviewed the allegations in the Complaint, the Court finds that plaintiffs have not sufficiently stated claims of retaliation. It is therefore respectfully recommended that NCA's motion to dismiss these claims be granted.

6) <u>Plaintiff Weaver's FMLA Leave Claim</u>

NCA asserts that Weaver's FMLA claim should be dismissed because he was not eligible for FMLA leave:

> [H]is bare allegation that 'he was an eligible employee' is not

---

[51]The Court notes that the only potential factual allegation is located in plaintiff Weaver's Compliant: "Plaintiff complained that defendants were depriving him of his rights under the FMLA, by not granting his request for intermittent leave." (Weaver Compl. ¶ 76). However, as the Court is recommending that plaintiff Weaver's underlying FMLA claim be dismissed for other reasons, the Court is also recommending that his retaliation claim be dismissed, irrespective of any factual allegations, or lack thereof, regarding complaints made. (<u>See</u> discussion, <u>infra</u> at 85-88).

> sufficient to transform his allegations into a plausible claim for
> relief under the FMLA. Weaver does not dispute . . . that he only
> worked only slightly more than 900 hours during the relevant time
> frame, which rendered him ineligible for FMLA leave as a matter
> of law. . . . [this] undisputed statement is dispositive and an
> insurmountable hurdle for him to assert an FMLA claim.

(Defs.' Reply at 20; see also Defs.' Mem. at 61-63). Therefore, NCA asserts that "Weaver has

not asserted a plausible claim for relief. . . . There are no factual allegations that purport to

establish his eligibility for leave under the FMLA." (Defs.' Mem. at 61-62). "[H]e never

qualified for any rights provided by the FMLA. As a matter of law, he cannot maintain a claim

for the denial of a right he never had." (Id. at 63). NCA also asserts, as it did with the Section

1981 and breach of contract claims, that Weaver's assertions that "NCA refused to accommodate

his scheduling requests and docked his pay" are incorrect because NCA was not Weaver's

employer, nor was NCA a party to Weaver's employment agreement with PARC U.S., which

indicates that PARC U.S. would make all decisions regarding sick leave. (Id. at 62). Lastly,

since NCA asserts that Weaver has not sufficiently alleged a prima facie case for his FMLA

leave violation, it likewise asserts that he has failed to assert an FMLA retaliation claim. (Id.)

    In response to NCA's motion to dismiss Weaver's FMLA Leave Claim, plaintiffs argue

that Weaver's Complaint satisfies the pleading requirements in order to bring an action under the

FMLA. (Pls.' Mem. at 44-45). In essence, Weaver has alleged that he was an eligible employee,

that he sought leave under the FMLA for reasons permitted by the Act, and that his leave was

denied. (Id. at 45). However, to the extent that plaintiff has failed to assert that he worked the

requisite number of hours to qualify for FMLA leave, he has failed to meet the pleading

requirements for FMLA eligibility.

Courts in this circuit have held that "it is insufficient for Plaintiff to 'merely assert in a conclusory manner that he is eligible without stating any facts that relate to the definition of an eligible employee.'" Smith v. Westchester County, No. 09 CV 5866, 2011 WL 570141, at *9 (S.D.N.Y. Feb. 15, 2011) (quoting Spurlock v. NYNEX, 949 F. Supp. 1022, 1033 (W.D.N.Y. 1996) (finding that plaintiff had failed to state a claim under the FMLA because he had failed to address in his complaint whether he was both employed by his employer for at least twelve months and worked at least 1,250 hours in the twelve months preceding the requested leave)).

Even "simply alleging that the employee was 'employed full-time,' is not enough to establish the 1,250 hour requirement" under the FMLA. Smith v. Weschester County, 2011 WL 570141, at *9 (quoting Simmons v. N.Y.C. Transit Aut., No 96 CV 3414, 2001 WL 984905, at *2 (E.D.N.Y. July 6, 2001)); see also Roff v. Low Surgical & Medical Supply, Inc., No. 03 CV 3655, 2004 WL 5544995, at *8 (E.D.N.Y. May 11, 2004) (holding that "[a]lthough the factual allegations contained in plaintiff's complaint suggest that she was a full time employee of defendant since September 2000, they are insufficient to establish that she actually performed at least 1,250 hours of service during the twelve month period immediately preceding her requested leave, as required by FMLA. Accordingly, plaintiff's complaint fails to establish that she was an 'eligible employee' within the meaning of FMLA"); Vicioso v. Pisa Bros., Inc., No. 98 CV. 2027, 1998 WL 355415, at *2 (S.D.N.Y. July 1, 1998) (dismissing plaintiff's complaint because although plaintiff claimed that "she was employed full-time by [defendant] for more than three years, such an allegation does not establish that she actually performed at least 1,250 hours of service during the twelve-month period immediately preceding her leave").

In Smith, the court granted defendants' motion to dismiss plaintiff's FMLA interference claim even though plaintiff had gone a step further and had alleged that he "'had provided 1,250 hours of service' during the previous twelve months." Smith v. Weschester County, 2011 WL 570141, at *10. The court found that allegation to be insufficient because plaintiff "d[id] not specify the twelve-month period to which he [wa]s referring," or "on what date he applied for leave, or when the leave was to begin; thus, he has not pled that he worked 1,250 hours in the applicable twelve-month period." Id.

Plaintiff Weaver's allegations with respect to his FMLA claim are limited to his conclusory statement that "Plaintiff was an eligible employee, and defendant an employer, for the purposes of the FMLA." (Weaver Compl. ¶ 67). Plaintiff Weaver also alleges that he "was employed by Defendants as a Flight Engineer from October 1998 through his unlawful termination on March 31, 2008." (Id. ¶ 17). Although Weaver does not need to establish a prima facie case for his claim that defendants interfered with his rights under the FMLA in order to survive NCA's motion to dismiss, "[n]othing in the Complaint even hints" that Weaver has an FMLA claim against NCA. Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 219.

Accordingly, it is respectfully recommended that NCA's motion to dismiss plaintiff Weaver's FMLA claim, as well as his FMLA retaliation claim,[52] be granted.

---

[52]To the extent that the NCA raises questions "about to whom plaintiff made the request for leave [and] who denied the request," and claims that it is PARC U.S., and not NCA, who schedules sick time (Pls.' Mem. at 45; Def. Mem. at 62), these are factual questions more appropriately considered after the parties have engaged in discovery. They are not necessary elements in order to assert an FMLA claim.

7) Plaintiff Frith's ADA Claim

Defendant NCA also asserts that plaintiff Frith's ADA claims for disability discrimination, failure to accommodate, and retaliation, should be dismissed for failure to allege a prima facie claim. (Defs.' Mem. at 64). Again, NCA argues that it was not Frith's employer and cannot be considered his employer for purposes of applying the ADA. (Id.) Moreover, NCA asserts that Frith has not sufficiently alleged that he was qualified for a position, as defined by the ADA, that he "sought or was denied an accommodation for his alleged disability," or that he "suffered an adverse employment action because of his disability or the leave he took after his injury." (Id. at 64-65). NCA asserts that "the sequence of events Frith describes in his Complaint suggest that his shoulder injury was completely unrelated to his termination" upon the retirement of the Classics planes. (Id. at 65). Defendant NCA argues that Frith's claims under the ADA are limited to "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." (Id.) NCA also seeks dismissal of Frith's retaliation claim under the ADA, arguing that he has "failed entirely to proffer any factual allegations to support his ADA retaliation claim." (Id. at 66).

In response, plaintiffs again emphasize that "NCA was a joint employer of plaintiff" and that NCA made the decisions regarding his scheduling and time off; NCA should therefore "be liable for discrimination under the ADA." (Pls.' Mem. at 46). Plaintiffs also assert that Frith has "set forth a plain statement of his claims, showing that he is entitled to relief." (Id.) According to plaintiffs, Weaver "states that he was injured on the job in or about December 2007. Plaintiff was able to perform the job of First Officer, despite his disability. Plaintiff was denied a

89

reasonable accommodation and employment opportunities, on the basis of his disability. Plaintiff was then terminated after opposing, and complaining about having been treated in a retaliatory fashion." (Id. at 46-47).

Specifically, Frith's Complaint alleges that: "In or about December 2007, prior to learning about his termination, Mr. Frith was injured on the job. . . . when he slipped and fell on ice. Mr. Frith suffered injury to his shoulder. Mr. Frith was on leave for his injury, when he was notified that his employment would be terminated." (Frith Compl. ¶ 25). With respect to defendant NCA, Frith further claims that PARC, PARC Aviation, and "NCA discriminated against plaintiff on the basis of his disability when [they] failed to provide plaintiff with a reasonable accommodation, and denied employment opportunities to him, in the form of upgrades, on the basis of his disability, in violation of the ADA." (Id. ¶¶ 59-62). Frith further alleges that "[d]efendants engaged in disparate and discriminatory treatment on the basis of disability, when plaintiff was injured on the job in close temporal proximity to his termination." (Id. ¶ 21). Frith also alleges that he "was qualified for employment as a First Officer despite his disability." (Id. ¶ 58).

As explained in detail above, plaintiff's "complaint need not establish a prima facie case of employment discrimination to survive a motion to dismiss; however, 'the claim must be facially plausible and must give fair notice to the defendants of the basis for the claim.'" Barbosa v. Continuum Health Partners, Inc., 716 F. Supp. 2d at 215, 218 (quoting Fowler v. Scores Holding Co., 677 F. Supp. 2d at 679). The Court finds that Frith's Complaint fails to meet these minimal requirements.

A *prima facie* case of discrimination under the ADA requires that plaintiff demonstrate that: 1) his employer was subject to the ADA; 2) he suffered from a disability within the meaning of the ADA; 3) that he could perform the essential functions of his job; and 4) that he was fired because of his disability. See, e.g., Jacques v. DiMarzio, Inc., 386 F.3d 192, 198 (2d Cir. 2004); Ryan v. Grae & Rybicki, P.C., 135 F.3d 867, 869-70 (2d Cir. 1998). Frith's allegations fail to set forth sufficient facts from which the Court could determine the plausibility of many of these elements of his claim.

First, Frith fails to allege any facts regarding his shoulder injury from which the Court could determine that his injury qualifies as a disability under the ADA. "To establish a disability under the ADA, there must be some proof of permanency. In other words, the limitation on the claimed major life activity cannot be temporary." Ragusa v. Malverne Union Free School Dist., 582 F. Supp. 2d 326, 341 (E.D.N.Y. 2008) (citing Adams v. Citizens Advice Bureau, 187 F.3d 315, 316-17 (2d Cir. 1999) (holding that a temporary neck, back, and knee injury lasting three and a half months not a disability); Colwell v. Suffolk County Police Dep't, 158 F.3d 635, 646 (2d Cir. 1998) (finding that a temporary impairment of seven months was not substantially limiting); McNamara v. Tourneau, Inc., 496 F. Supp. 2d 366, 376 (S.D.N.Y. 2007) (finding that an injury lasting only eight weeks was not a qualifying disability); Williams v. Salvation Army, 108 F. Supp. 2d 303, 312-13 (S.D.N.Y. 2000) (stating that "temporary, non-chronic impairments of short duration, with little or no long-term or permanent impact, are usually not disabilities")). Frith does not allege any facts with respect to the duration or severity of his injury.

Furthermore, as defendants note, Frith fails to allege that he sought and was denied an

accommodation, which is required in order for his employer to be liable under the ADA. (See

Defs.' Mem. at 64-65). In addition, although Frith alleges that he was notified of his termination

while he was out on leave, he "has not alleged that he suffered an adverse employment action

because of his disability or the leave he took after his injury." (Id. at 35). Therefore, as with

Weaver's FMLA claim, "[n]othing in [Frith's] Complaint even hints that" Frith qualifies as

disabled under the ADA or that his termination was causally related to or the result of his alleged

disability, as is required to survive defendant NCA's motion to dismiss. Barbosa v. Continuum

Health Partners, Inc., 716 F. Supp. 2d at 219.

The Court therefore respectfully recommends that plaintiff Frith's ADA claim and his

ADA retaliation claim be dismissed.


## C. Motion to Amend

To the extent that the district court dismisses any of plaintiffs' claims pursuant to Rule

12(b)(6), plaintiffs have requested permission to file an amended complaint pursuant to Rule

15(a) of the Federal Rules of Civil Procedure. (Pls.' Mem. at 3, 48).

Rule 15(a) of the Federal Rules of Civil Procedure provides that an amendment as of

right may be made at any time prior to the service of a responsive pleading. Once a response to a

complaint has been filed, a plaintiff may amend the complaint "only with the opposing party's

written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). However, the Rule also states

that "[t]he court should freely give leave when justice so requires," id., and the Rule has been

liberally construed. See Foman v. Davis, 371 U.S. 178, 182 (1962). As the court in Chapman v.

YMCA of Greater Buffalo noted, "[t]he stated purpose of Rule 15 is to allow a party to correct an error that might otherwise prevent the court from hearing the merits of the claim." 161 F.R.D. 21, 24 (W.D.N.Y. 1995).

Plaintiffs assert that "[i]n this case, leave to amend should be freely given. Discovery has not yet begun, nor have defendants answered plaintiffs' complaints. Consequently, defendants cannot claim any prejudice." (Pls.' Mem. at 3, 48). Defendants object to this request "because plaintiffs have failed to provide proposed amended Complaints or otherwise specify how they would cure the pleading deficiencies highlighted by NCA." (Defs.' Reply at 21). However, in light of NCA's pending Motion to Dismiss, it would have been premature and unwise for plaintiffs to have simultaneously proposed amendments to their Complaints, essentially admitting deficiencies therein.[53]

Therefore, to the extent that the district court grants NCA's motion to dismiss with respect to one or more of plaintiffs' claims, the Court respectfully recommends that plaintiffs be given the opportunity to propose amended pleadings at that time.

---

[53]Defendants' counsel's comments during the oral argument reiterate this notion: "I would just note that the plaintiffs have made a motion or a cross motion to amend the complaint if necessary. . . . I think it's very telling that they recognize that there are some issues here with respect to the Rule 12(b)(6) motion that they might need to amend." (Tr. at 37). However, plaintiffs' counsel responded that "we have requested leave to amend in the alternative not because we perceive any deficiency in the complaint, but because it's the prudent thing to do with multiple parties and multiple plaintiffs. . . . if we thought there was something blatantly defective or deficient, we would have looked to amend the complaint." (Id. at 38). As the Court noted during the oral argument, the Court is "not drawing any conclusions" from the fact that plaintiffs have moved, in the alternative, for permission to amend. (Id.)

CONCLUSION

Accordingly, having reviewed the parties' respective submissions, the Court respectfully recommends that defendants' motion to dismiss for *forum non conveniens* be denied; that NCA's motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) be granted in part and denied in part. The Court respectfully recommends that the following claims be dismissed: 1) all of plaintiffs' retaliation claims; 2) plaintiff Weaver's FMLA and FMLA retaliation claims; and 3) plaintiff Frith's ADA and ADA retaliation claims.

If the district court determines that certain of plaintiffs' claims should be dismissed for failure to state a claim, the Court further recommends that plaintiffs first be afforded the opportunity to amend their pleadings.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 72(b); Small v. Sec'y of Health and Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED.**

Dated: Brooklyn, New York
July 25, 2011

Cheryl L. Pollak
United States Magistrate Judge

94